# EDWARD EVANS v. STATE OF MARYLAND

[No. 57, September Term, 1975.]

*Decided November 25, 1975.*

642

The cause was argued before ORTH, C. J., and MOYLAN and GILBERT, JJ.

*Victoria A. Salner, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Dennis M. Henderson, Assistant Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Clifton Gordy, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

It was but a matter of time before the common law's crazy quilt of murder and manslaughter—eight hundred years in the making and intricately interweaving Stuart modification of Tudor substance with Victorian adaptation of Georgian procedure—would come under the cold glare of latter-day

644

due process. That time came on June 9, 1975, with the Supreme Court's decision in *Mullaney v. Wilbur*, 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975). The conviction of Edward Evans, appellant, by a Baltimore City jury for murder in the second degree gives us occasion to assess the impact of *Mullaney v. Wilbur* on Maryland's version of Anglo-America's ancient handiwork on felonious homicide. The impact is significant.

Indeed, the implications are so extensive that a shorthand summary of them is in order before launching into a more detailed analysis.

*Retroactivity in a Nutshell*

> *Mullaney v. Wilbur will be fully retroactive.* (Part IA)
> *It will apply:*
>
> 1. *Where there was an erroneous allocation of the burden of persuasion on the question of mitigation (that issue being fairly in the case) and the verdict was for murder in the second degree.* (Part ID)
> 2. *Where there was an erroneous allocation of the burden of persuasion on the question of justification or excuse (either issue being fairly in the case) and the verdict was for any degree of felonious homicide.* (Part IE)
>
> *It will not apply:*
>
> 1. *Where there was an erroneous allocation of the burden of persuasion on the question of mitigation (that issue being fairly in the case) and the verdict was for:*
>    a. *Manslaughter* (Part IB) *or*
>    b. *Murder in the First Degree.* (Part IC)
> 2. *Where there was an erroneous allocation of the burden of persuasion on the questions of mitigation, justification or excuse but where they were not issues in the case.* (Part IF)

*Prospectivity in a Nutshell*

*Mullaney v. Wilbur will not render unconstitutional:*

1. *An innocuous statement as to burden of proof.* ("All *murder* is presumed to be murder in the second degree.") *For semantic rather than constitutional reasons, however, the usage should be discontinued.* (Part IID)

2. *Any rule of substantive law:*
   a. *Our various forms of first-degree murder.* (Part IIE1)
   b. *The doctrine of transferred intent.* (Part IIE2)
   c. *The various forms of murderous mens rea which we categorize as implied malice.* (Part IIE3)

3. *A proper inference, such as the inference of intent to kill or the inference of the intent to do grievous bodily harm from the use of deadly force.* (Part IIF)

4. *A presumption (in the Thayer-Wigmore tradition) simply putting upon a defendant the onus of producing sufficient evidence to generate a jury issue (unless the evidence in the State's case itself generates the issue), at which point the presumption is totally dissipated leaving upon the State the burden of persuasion on the generated issue beyond a reasonable doubt.* (Part IIH)

*Mullaney v. Wilbur will render unconstitutional:*

1. *A presumption (in the Morgan tradition) placing upon a defendant an ultimate burden of persuasion, by any standard of proof, on any issue.* (Part IIG) *This ruling applies, by way of a partial list of examples, to such defenses as:*
   a. *Any theory of justification* (including self-defense in some forms).
   b. *Any theory of excuse* (including self-defense in other forms and including accident or misadventure).

c. *Any theory of mitigation* (including hot-blooded response to legally adequate provocation).

d. *Intoxication.*

e. *Entrapment.*

f. *Duress or Coercion.*

g. *Necessity.*

*Mullaney v. Wilbur will have a collateral influence beyond its direct impact*:

> The way through the labyrinth is difficult enough without ambiguous and misleading signposts to send us in false directions. Though the task be Herculean, the Augean Stables of our language must be cleansed. At the very least, Maryland's jury instructions on the subject of homicide are in immediate need of radical revision. (Passim)*

## The Present Case

The facts necessary to our judgment here are few. At some time between 2 and 3 p.m. on June 20, 1974, the appellant struck Alonzo Counts with a knife several times. The victim bled to death shortly thereafter, the fatal blow having been a stab to the neck. The homicidal agency of the appellant is not in dispute. Testimony by State's witnesses and defense witnesses alike, including testimony from the appellant himself, established a pattern of angry and violent confrontations between the appellant and the victim during the hour immediately preceding the homicide, such confrontations broken by periods when the two were out of contact with one another. There was evidence from which the jury could have concluded that the appellant struck the victim without justification, excuse or legally adequate provocation. Just as surely, there was evidence from which the jury could have concluded that the appellant struck in

---

* A number of opinions dealing with and explaining various aspects of the Mullaney v. Wilbur matrix of problems will be filed in the next few days.

necessary self-defense or that he struck in hot blood in the course of mutual combat. It is sufficient for present purposes to note that the questions of excuse (the self-defense in this case) and mitigation (by way of the hot blood of mutual combat) were substantially present as issues in the case. Correct instructions were, therefore, in order both to define those issues and to allocate the burden of persuasion as to them by the appropriate standard of proof.

With respect to the allocation of the burden of persuasion generally as to these issues, the trial court's instruction to the jury was, in pertinent part:

> "You are advised that the statutory law of Maryland provides that all murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate, and premeditated killing, shall be murder in the first degree. The law further provides that all other kinds of murder shall be deemed to be murder in the second degree. Upon proof by the State of murder, without anything else, the presumption is that it is murder in the second degree. The State has the burden of proving the elements of the crime which would raise the degree to murder in the first degree. That is, in this case, that it was wilful, deliberate, and premeditated. *The Defendant has the burden of showing the elements which would reduce the crime to manslaughter or which would make the homicide justifiable and excusable.*" (Emphasis supplied)

At another point in the instruction, the court defined the element of malice necessary to a finding of murder and also referred to the presumption of malice:

> "The difference between murder in the first degree and murder in the second degree is this; where the evidence proves beyond a reasonable doubt that the killing was done with *malice, that it was the result of the intentional doing of a*

*wrongful or illegal act to another without legal excuse or justification, then murder in the second degree has been proven under our law. The use of a deadly weapon directed at a vital part of the body gives rise to the presumption that malice existed.* Subsequently, *you, as jurors, may also draw an inference that the killing was done with malice from the fact that the deadly weapon was used and directed at a vital part of the body of the deceased.*" (Emphasis supplied)

The immediately following instruction mingled the self-defense, which might render a homicide excusable, with the provocation, which might limit it to manslaughter. It seemed to postulate that all killing not in self-defense is *ipso facto* without adequate provocation and, therefore, malicious:

"No provocation, however grievous, will reduce a voluntary homicide to manslaughter if the circumstances show that the slayer acted not in self-defense but from malice."

In going on to the subject of self-defense, the trial judge seemed clearly to put the burden of establishing its necessary elements upon the defendant:

"The Defendant in this case contends, however, that he is not guilty of any degree of homicide by reason of the fact that he was acting in self-defense. The Defendant has contended that the deceased, Alonzo Counts, was stabbed in the act of assaulting the Defendant, Edward Evans.

*In order to justify or excuse the killing of another in self-defense it is necessary to establish that the Defendant was not the aggressor and did not provoke the conflict, that the Defendant believed at that time that he was in such imminent danger of losing his own life or suffering bodily harm, that it was necessary for him to take the life of the deceased, to save himself, and that the*

*circumstances were such at the time to warrant reasonable grounds for such belief in a mind of ordinary reason."* (Emphasis supplied)

In ultimately allocating the burden of persuasion on the question of self-defense, the trial judge accurately recited the self-contradictory and mutually exclusive statements which have chronically plagued the common law of Maryland on this elusive and confused subject. The burden of proving all elements of the crime seems to be upon the State, but the burden of negating one of those elements seems simultaneously to be upon the defense. The quandary is unresolved as to what to do if the defense has offered enough persuasion to throw doubt upon the State's case but not enough persuasion to establish self-defense affirmatively by a preponderance of the evidence:

"Excusable self-defense is where a person becomes engaged in a sudden affray or combat and in the course of the affray or combat kills his adversary to save himself from death or great bodily harm after retreating as far as he could with safety. The Defendant has presented evidence tending to show that his act was justifiable and excusable self-defense. *If his evidence, considered with all the other evidence, raises a reasonable doubt to his guilt; if that has been shown, the Defendant is entitled to an acquittal.*

*The Defendant is not obliged to establish this defense beyond a reasonable doubt, but by a preponderance of the proof. The prosecution must prove him guilty beyond a reasonable doubt."* (Emphasis supplied) [1]

---

1. How does a fact finder deal with the instruction when he is 49% persuaded that a defendant acted in self-defense? For the indisputable self-contradiction of this instruction, see Part IIG *infra* and see *State v. Millett* (Me.), 273 A. 2d 504, 506; *State v. Malone,* 327 Mo. 1217, 39 S.W.2d 786; and *State v. Grady,* 276 Md. 178, 345 A. 2d 436, there cited and discussed.

### The Preliminary Hurdle of Plain Error

Before considering the effect of *Mullaney v. Wilbur* upon the instructions in this case specifically and upon the common law of Maryland with respect to felonious homicide generally, one preliminary hurdle must be overcome: The appellant lodged no objection to the instructions given the jury in this case. Although ordinarily the failure to object to an instruction will preclude review on appeal, *Parker v. State*, 4 Md. App. 62, 67, 241 A. 2d 185; *Hicks v. State*, 3 Md. App. 225, 238 A. 2d 577; Maryland Rule 756 g, certain circumstances will cause this Court to exercise its discretion and to notice "plain error". These exceptional circumstances were incisively analyzed and lucidly set out by Judge Powers in *Brown v. State*, 14 Md. App. 415, 422, 287 A. 2d 62:

> " [W]e think that as a general guide, we may say that under Rule 756 g we will take cognizance of and correct an irremediable error of commission, but not an error of omission. Of course, the error must be plain, and material to the rights of the accused, and, even then, the exercise of our discretion to correct it should be limited to those cases in which correction is necessary to serve the ends of fundamental fairness and substantial justice."

See also *Bieber v. State*, 8 Md. App. 522, 533-534, 261 A. 2d 202. This is such a case.

For reasons to be hereinafter discussed, we hold that there were errors in the instructions. They were errors of commission; they were irremediable; they were plain; they were material to the rights of the appellant. We note moreover as we exercise our discretion in this regard, although the point is not of pivotal significance, that the appellant and his attorney could not have anticipated *Mullaney v. Wilbur* and may have been persuaded that the instructions given accurately reflected the law of Maryland. More significantly, we exercise our discretion in noticing this particular "plain error" because of the legion of cases already beginning to surface in the wake of *Mullaney v.*

*Wilbur*, and because of the inevitably greater legions yet to follow. We deem a prompt review of these instructions, and those like them, "necessary to serve the ends of fundamental fairness and substantial justice" even beyond the confines of this particular case. This case is, in short, an appropriate and necessary vehicle.

## I. The Ghost of Homicide Past

### A. The Retroactivity of Mullaney v. Wilbur

The decision in *Mullaney v. Wilbur*, which decision governs our holding in this case, was handed down by the Supreme Court on June 9, 1975. The appellant's trial was on November 12, 13 and 14, 1974, some eight months earlier. The immediate question arises as to whether *Mullaney v. Wilbur* will be applied retroactively and, if so, to what extent. The answer is that it must be given fully retroactive effect.

In this regard, we conclude that *Mullaney v. Wilbur* was but an application to a murder conviction of the broad constitutional principle earlier laid down in *In re Winship*, 397 U. S. 358, 364, 90 S. Ct. 1068, 25 L.Ed.2d 368, 375 (1970):

> "Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

At the very outset of the *Mullaney v. Wilbur* opinion, the issue before the Court was posed explicitly in terms of compliance with the broad mandate of *Winship*:

> "We must decide whether this rule [the Maine rule as to the burden of persuasion on the issue of manslaughter] comports with the due process requirement, as defined in *In re Winship*. . ., that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged." *Mullaney v. Wilbur*, 44 L.Ed.2d, at 511.

The consistent and, indeed, exclusive theme running throughout the entire *Mullaney v. Wilbur* opinion is the applicability to homicide law of *Winship's* requirement that the State prove every element of a crime beyond a reasonable doubt.[2] Any doubt as to the retroactive effect of

---

**2.** "Respondent contended, therefore, that this Court's decision in *Winship* requires the prosecution to prove the existence of that element beyond a reasonable doubt." 44 L.Ed.2d, at 513. "With respect to *Winship*, which was decided after respondent's trial, the court noted that it did not anticipate the application of the *Winship* principle to a 'reductive factor' such as the heat of passion on sudden provocation." *Ibid.* "Thus, the District Court concluded, *Winship* requires the prosecution to prove malice aforethought beyond a reasonable doubt . . ." *Ibid.* "The Court of Appeals equated malice aforethought with 'premeditation,' *id.*, at 947, and concluded that *Winship* requires the prosecution to prove this fact beyond a reasonable doubt." P. 514. "On remand, that court again applied *Winship*, this time to the Maine law as construed by the Maine Supreme Judicial Court." *Ibid.* "For these reasons the Court of Appeals held that the principles enunciated in *Winship* control, and that to establish murder the prosecution must prove beyond a reasonable doubt that the defendant did not act in the heat of passion on sudden provocation." *Ibid.* "Respondent argues that the Maine Supreme Judicial Court's construction of state law should not be deemed binding on this Court since it . . . is a transparent effort to circumvent *Winship*." Pp. 514-515. "Petitioners, the warden of the Maine Prison and the State of Maine, argue that despite these considerations *Winship* should not be extended to the present case." P. 518. "This distinction is relevant, according to petitioners, because in *Winship* the facts at issue were essential to establish criminality in the first instance. . . ." *Ibid.* "In short, petitioners would limit *Winship* to those facts which, if not proved, would wholly exonerate the defendant." *Ibid.* "By drawing this distinction . . . Maine denigrates the interests found critical in *Winship*." P. 519. "Moreover, if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law." *Ibid.* "*Winship* is concerned with substance rather than this kind of formalism. The rationale of that case requires an analysis that looks to the 'operation and effect of the law as applied and enforced by the State' . . . ." Pp. 519-520. "In *Winship* the Court emphasized the societal interests in the reliability of jury verdicts. . ." P. 520. "These interests are implicated to a greater degree in this case than they were in *Winship* itself." *Ibid.* "Both the stigma to the defendant and the community's confidence in the administration of the criminal law are also of greater consequence in this case, since the adjudication of delinquency involved in *Winship* was 'benevolent' in intention, seeking to provide 'a generously conceived program of compassionate treatment.' *In re Winship* . . ." *Ibid.* "Not only are the interests underlying *Winship* implicated to a greater degree in this case, but in one respect the protection afforded those interests is less here. In *Winship* the ultimate burden of persuasion remained with the prosecution, although the standard had been reduced to proof by a fair preponderance of the evidence." *Ibid.*

The separate concurring opinion of Justice Rehnquist, in which Chief Justice Burger joined, also made it clear that the issue in *Mullaney v. Wilbur* was the applicability of *In re Winship*:

> "I agree with the Court that *In re Winship* . . . does require that the prosecution prove beyond a reasonable doubt every element which constitutes the crime charged against a defendant." P. 523.

*Winship* was resolved in *Ivan V. v. City of New York*, 407 U. S. 203, 204-205, 92 S. Ct. 1951, 32 L.Ed.2d 659, 661-662 (1972):

"We disagree with the holding of the Court of Appeals that *Winship* is not to be applied retroactively.

'Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.' *Williams v. United States* . . .

*Winship* expressly held that the reasonable-doubt standard 'is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence — that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law' . . . . 'Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt.' To this end, the reasonable-doubt standard is indispensable, for it 'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.' ' . . .

Plainly, then, the major purpose of the constitutional standard of proof beyond a reasonable doubt announced in *Winship* was to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect."

It follows, therefore, ineluctably that *Mullaney v. Wilbur* is also "to be given complete retroactive effect." The fully retroactive operation of *Mullaney v. Wilbur*, however, does not, *ipso facto*, forebode another *Schowgurow v. State*,[3] 240 Md. 121, 213 A. 2d 475, destined to empty the prisons of all inmates serving terms for any form of felonious homicide. We will now look to the limitations upon that retroactivity, not limitations on the ability of *Mullaney v. Wilbur* to reach into the distant past but rather limitations upon the classes of convicted felons eligible for its coverage.

The full ramifications of *Mullaney v. Wilbur* will be discussed in greater detail hereinafter in dealing with the present and future impact of the decision on Maryland law. For the moment, it is enough to set out, by way of shorthand summary, that it dooms as unconstitutional any procedural device which 1) imposes upon a defendant a burden of proving, by any standard, his innocence as to any element of a crime or 2) relieves the State of its burden of ultimate persuasion beyond a reasonable doubt as to any issue fairly in the case.

B. *Erroneous Allocation of the Burden of Persuasion as to Mitigation (Mitigation Being an Issue in the Case) Where the Conviction is Only for Manslaughter*

The common error in this regard would be, in its lesser form, an instruction to the jury to the effect that, under certain circumstances, felonious homicide is presumed to be with malice and is, therefore, presumed to be murder in the second degree (thereby relieving the State, where mitigation is a legitimate issue in the case, of proving the absence of mitigation beyond a reasonable doubt); and, in its slightly more aggravated form, an instruction to the jury going further and placing upon the defendant the burden of proving (by any standard) such mitigation as would lower the felonious homicide to the manslaughter level. Notwithstanding such error, where the verdict is one of

---

**3.** A case voiding thousands of pending indictments and hundreds of non-final convictions because of a religious test for office for grand jury service.

manslaughter only, the defendant has suffered no cognizable harm — any error is manifestly harmless, at the constitutional level, and non-prejudicial, at the non-constitutional level.

Where the issue which a defendant has fairly generated (see Part IIH *infra*) is whether sufficient mitigation existed to lower the *mens rea* to the non-malicious, though still felonious, level of manslaughter, the verdict has cured the error. The defendant has received everything for which he was contending and to which he may arguably have been entitled. He was, to be sure, put to an unfair burden in lowering the conviction to the manslaughter level, but he nonetheless shouldered his burden successfully. The law will not countenance the reversal of a manslaughter conviction, which the defendant agrees he deserved, merely so that upon retrial he may achieve the same end more effortlessly.

In concluding that the verdict as to a lesser charge cured any error in instructions as to a greater charge, we are not here dealing with the question of whether the erroneous submission of greater charges to the jury, where the record reveals that judgments of acquittal should have been granted as to them, might or might not constitute error by facilitating a compromise verdict on the lesser charge. We intimate nothing in that regard.

We are dealing here with a question of a different order. It is the broad consensus of authority, and we concur therein, that a mere error in instructions as to a greater degree of a crime will be deemed immaterial and non-prejudicial where the verdict is brought in for a lesser degree of the crime.

In this regard, we find highly persuasive the statement of law contained at 40 Am.Jur.2d *Homicide*, § 528, "Effect of erroneous instructions — As to higher grade or degree, where defendant convicted of lower," p. 784:

"The rule that the accused ordinarily cannot complain of an error in instructing the jury as to the higher grade or degree of the crime charged where the jury is properly instructed as to, and returns a verdict of guilty of, the lower grade or

degree, is especially applicable with respect to charges upon the different grades and degrees of culpable homicide. Thus, error in a charge upon first degree murder is not to be deemed prejudicial to one convicted of a lower degree of murder, voluntary manslaughter, or involuntary manslaughter."

And see 24B C.J.S. *Criminal Law* § 1922(15)c, "Cure of Error by Verdict or Judgment," pp. 197-200; *State v. Carabajal,* 26 N. M. 384, 193 P. 406; *State v. Brookshire* (Mo.), 368 S.W.2d 373; *Ruffin v. State* (Del.), 123 A. 2d 461; *Lash v. State,* 97 Ga. App. 622, 103 S.E.2d 653; *France v. Commonwealth* (Ky.), 323 S.W.2d 868; *Sykes v. State* (Tex.Cr.App.), 399 S.W.2d 349; *State v. Shipley,* 259 Iowa 952, 146 N.W.2d 266; *State v. Jiminez,* 93 Idaho 140, 456 P. 2d 784; *State v. Lee,* 255 S. C. 309, 178 S.E.2d 652; *Fulton v. State,* 127 Ga. App. 711, 194 S.E.2d 615; *People v. Strickland,* 114 Cal. Rptr. 632, 523 P. 2d 672; *King v. State* (Miss.), 315 So. 2d 925. See also 4 *Warren on Homicide,* § 380, "Effect of Conviction of Manslaughter," pp. 643-646.

As to the highly speculative theory that an erroneous instruction by way of lessening the burden of proving some higher grade of an offense might in some vague and indefinite way have facilitated a compromise on a lesser grade of the offense, on which a conviction was fully supported by the evidence, we agree with the Supreme Court of Pennsylvania in *Commonwealth v. Kaminsky,* 434 Pa. 38, 252 A. 2d 695. In that case, the Pennsylvania high court agreed that an instruction placing the burden upon a defendant to reduce the crime from murder to manslaughter was in error. The conviction in that case was, however, only for manslaughter. In rejecting the claim that the error may have facilitated a prejudicial compromise, the court said, at 252 A. 2d 696:

"Even if the trial judge placed an extra burden on appellant to reduce his conviction to voluntary manslaughter, the harmless nature of the error becomes clear in light of the subsequent voluntary

manslaughter verdict. It can hardly be argued that if the jury had been given the correct charge on voluntary manslaughter, they would have been more inclined to find appellant not guilty. The only possible effect of the erroneous instruction was for the jury to think appellant had to prove more in order to convince them that he was *only* guilty of voluntary manslaughter; but he *did* convince them that this was the proper verdict despite the handicap. Thus the best verdict appellant could have received if the charge had been correct was the *same* one the jury actually rendered.

Appellant argues that because compromise verdicts often occur in criminal cases, the introduction of the incorrect standard as to voluntary manslaughter might have affected the process by which the jury reached the compromise. However whether this was a compromise verdict is pure speculation; whether a different charge would have changed the 'compromise' ventures even further into the territory of the uncertain. It certainly does not seem appropriate for a court to declare an otherwise harmless error to be grounds for reversal on the basis of such conjecture."

In this regard, see also *Walker v. People* (Colo.), 248 P. 2d 287, 299.

The curative effect of the verdict upon the erroneous allocation of the burden of persuasion (either by way of relieving the State of its burden or affirmatively placing the burden upon the defendant) would not be dissimilar if the verdict had been rendered in a court trial rather than in a jury trial. If, for example, the court, in gratuitously articulating its mental processes, had indicated an erroneous understanding of the allocation of the burden but had nonetheless convicted the defendant only of the lesser crime, the only resultant harm would have been that the defendant worked a little harder than necessary in obtaining the end he both sought and deserved — a harm not requiring a reversal.

## C. *Erroneous Allocation of the Burden of Persuasion as to Mitigation (Mitigation Being an Issue in the Case) Where the Conviction is for Murder in the First Degree*

By the same token, any error in instructing as to the allocation of the burden of persuasion on the subject of mitigation (such mitigation, for purposes of holding the homicidal *mens rea* down to the manslaughter level, being fairly an issue in the case) will have been cured by a verdict of murder in the first degree.[4] The evil aimed at by *Mullaney v. Wilbur,* where the issue is manslaughter versus murder, is that a presumption of malice unfairly relieves the State of the burden of proving non-mitigation (mitigation being fairly an issue in the case). Where the ultimate verdict is that of murder in the second degree, the presumption may, therefore, have been pivotal. Where, on the other hand, the verdict is murder in the first degree, the State will have proved every element, including the negating of hot blood, beyond a reasonable doubt and due process will not have been offended.

It is the well-settled law of Maryland that to prove murder in the first degree, the State must demonstrate beyond a reasonable doubt "that the killing was wilful, deliberate, and premeditated." *Wilson v. State,* 261 Md. 551, 564, 276 A. 2d 214. Our equally well-settled definitions of the terms wilfulness, deliberation and premeditation, all of which elements the State must prove beyond a reasonable doubt, make it clear that that act of proof will, *ipso facto,* have negated beyond a reasonable doubt any possibility that the killing was in "hot blood" — in sudden response to provocation where the passions had not yet had an

---

4. This analysis presupposes that the type of mitigation fairly in issue is of the common and orthodox "hot blood in response to legally adequate provocation" variety. The foreclosing effect of a first-degree murder conviction would not, however, apply in those very rare cases where manslaughter is predicated upon the far more esoteric extenuating circumstances, "not yet far advanced," of "an 'imperfect' right of self-defense or defense of others, or of crime-prevention, or of the defenses of coercion or necessity, in which the killing, though not justifiable, is not bad enough to be murder." LaFave and Scott, *Criminal Law* (1972), § 77, "Other-Extenuating-Circumstances Voluntary Manslaughter," pp. 583-586. This qualification, it should be noted, is little more than an academic possibility.

opportunity to cool and, therefore, to allow a deliberate judgment. These elements were well defined in *Hyde v. State*, 228 Md. 209, 215-216, 179 A. 2d 421:

> " 'Premeditated' means that the killing must have been meditated, planned in the mind, beforehand; that the design to kill must have preceded the killing by an appreciable length of time, time enough to deliberate; and in order to justify a conviction of first degree murder, the trier of facts must find the actual intent (wilfulness), the fully formed purpose to kill (deliberation), with *enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper* (lack of deliberation and premeditation), but that the mind has become fully conscious of its own design. Although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing be not the instant effect of impulse, if there be hesitation or doubt to overcome a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." (Emphasis supplied)

Cited with approval in *Wilson v. State, supra,* at 261 Md. 564-565.

*Chisley v. State*, 202 Md. 87, 106, 95 A. 2d 577, adopts the definitions of the terms as set out in *Hochheimer*:

> "*Hochheimer* . . . defines 'wilful' as follows: 'there must be a specific purpose and design to kill; ' 'deliberate' is defined: 'there must be full and conscious knowledge of the purpose to do so; ' and, 'premeditated' as: 'the design must have preceded the killing by an appreciable length of time, time enough to be deliberate. In order to justify a conviction of murder in the first degree, as thus defined, *the jury must find the actual intent, the*

*fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them, that this purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design.'* "(Emphasis supplied)

See also *Gladden v. State,* 273 Md. 383, 330 A. 2d 176, 178-179; *Cummings v. State,* 223 Md. 606, 611, 165 A. 2d 886; *Brown v. State,* 220 Md. 29, 38, 150 A. 2d 895; *Faulcon v. State,* 211 Md. 249, 257-258, 126 A. 2d 858; *Brooks v. State,* 3 Md. App. 485, 511-512, 240 A. 2d 114; *Leyva v. State,* 2 Md. App. 120, 123, 233 A. 2d 498.

Even granted a legally adequate provocation in the first place and the initial response of "hot blood" thereto, the establishment of the deliberation and premeditation necessary to constitute murder in the first degree is, by definition, the establishment of a "cooling time" for the hot blood. That factor is well defined at 40 Am.Jur.2d *Homicide* § 68, "Cooling time," pp. 360-361:

"The passion which renders the killing of a person voluntary manslaughter must have continued to exist until the commission of the homicidal act; if, from any circumstances whatever, it appears that the party reflected, deliberated, or cooled any period of time before the fatal stroke was given . . . the killing will amount to murder, being attributable to malice. . . ."

The State, in proving wilfulness, deliberation and premeditation [5] beyond a reasonable doubt, will not have

---

**5.** In the interest of practicality, this analysis has been confined to that variety of murder in the first degree involving a "wilful, deliberate and premeditated killing." (Art. 27, § 407) Although similar analyses could be made with respect to the negating of "hot blood" (and, thereby, the proving of malice) in cases involving the other mental states sufficient to establish first-degree murder — the intent to kill by poisoning or by lying in wait (§ 407); the intent to perpetrate an arson (§ 408); the intent to burn any barn, tobacco house, stable, warehouse or other outhouse, etc. (§ 409); or the intent to perpetrate rape, sodomy, mayhem, robbery, burglary, kidnapping, storehouse breaking, daytime housebreaking, or escape (§ 410) — it is difficult to hypothesize these mental states as hot-blooded responses to

relied upon a mere presumption of malice but will of necessity have *proved* the element of malice (meaning, within the context of this analysis, an intentional killing absent the mitigating circumstance of a hot-blooded response to a legally adequate provocation). "Malice and heat of passion cannot coexist." 40 Am.Jur.2d *Homicide* § 56, p. 350, citing *Vaughan v. State*, 201 Ala. 472, 78 So. 378, and *White v. State*, 44 Tex. Crim. 346, 72 S. W. 173. *A fortiori*, proof beyond a reasonable doubt of premeditated and deliberated malice will negate heat of passion. The requirement of *In re Winship* and *Mullaney v. Wilbur* that the State prove beyond a reasonable doubt every necessary element of the offense will have been fully satisfied.

In denying a writ of habeas corpus in the case of *Wilkins v. Maryland*, 402 F. Supp. 76, (filed on October 15, 1975), Judge C. Stanley Blair in the United States District Court for Maryland employed a similar analysis. Wilkins claimed that upon his trial in a Maryland criminal court he had been denied due process under *Winship* and *Mullaney v. Wilbur* when the jury was instructed that it could presume an unlawful killing to have been perpetrated with malice. Wilkins was convicted of murder in the first degree. Judge Blair ruled that the jury instructions, even if erroneous, were harmless because the first-degree murder conviction had cured any arguable error:

"In finding Wilkins guilty beyond a reasonable doubt of the willful, deliberate and premeditated killing of the victim — or alternatively, of killing the victim during the perpetration of a robbery — the jury necessarily rejected, *beyond a reasonable doubt*, that the defendant acted recklessly without an intention to take a life or in the heat of passion. Phrased otherwise, in proving the elements of first degree murder beyond any reasonable doubt in the jurors' minds, the state necessarily disproved

---

legally adequate provocation. The remote possibility of such an interesting collision of mental elements does not make a protracted analysis a profitable exercise, absent a concrete case in that regard.

manslaughter beyond a reasonable doubt. Accordingly, the gist of *Mullaney v. Wilbur, supra,* that the state prove all elements of an offense beyond a reasonable doubt, is satisfied in fact."

See also 4 *Warren on Homicide,* § 380, "Effect of Conviction of Murder in First Degree, pp. 639-641.

Nor will *Mullaney v. Wilbur* be applicable retroactively to any conviction of murder in the first degree rendered by a judge sitting without a jury (where mitigation is fairly an issue in the case). Even if the judge,[6] in the course of articulating his verdict, has gratuitously and erroneously mentioned the presumption of malice, his ultimate finding of the elements of wilfulness, deliberation and premeditation beyond a reasonable doubt will have cured, by making immaterial, any error of misunderstanding in that regard.

D. *Erroneous Allocation of the Burden of Persuasion as to Mitigation (Mitigation Being an Issue in the Case) Where the Conviction is for Murder in the Second Degree*

Where, on the other hand, an erroneous instruction has been given to the jury either to the simple effect that an intentional killing gives rise to a presumption of malice (thereby relieving the State of its burden of negating mitigation, where mitigation is fairly an issue in the case) or, in slightly more aggravated form, to the effect that the burden is upon the defendant to prove such mitigation as would lower murder to manslaughter, and the ultimate verdict is for murder in the second degree,[7] *Mullaney v.*

---

6. The appropriateness of measuring court trials as well as jury trials by the standard of *Mullaney v. Wilbur* is clear, since the undergirding issue dealt with by both *Mullaney v. Wilbur* and *In re Winship* is the ultimate allocation of the burden of persuasion. Jury instructions, the surface problem dealt with in *Mullaney v. Wilbur,* are simply one of the means employed in allocating the burden. It is, of course, the ultimate fact of allocation and not merely the means of the allocation which is critical on the question of due process of law.

7. A qualification in this terribly complex field is again necessary. We are, in the context of this analysis, dealing with the more typical of the "malicious" intents—1) intent to kill (express malice) and 2) intent to do

*Wilbur* will have retroactive application. Here the constitutional error is manifest, and the requirement of *Winship* that the State prove each and every element of its case beyond a reasonable doubt has not been met.

By the same token, a verdict rendered in a court trial of murder in the second degree will bear scrutiny under *Mullaney v. Wilbur* if the judge, in the course of rendering his decision, indicates that he relied upon the now unconstitutional presumption of malice or that he in any way placed upon the defendant the burden of proving such mitigation as would reduce murder to manslaughter (mitigation fairly being an issue in the case).

E. *Erroneous Allocation of the Burden of Persuasion as to Justification or Excuse (Either Being An Issue in the Case) Where the Conviction is for Felonious Homicide in Any Degree*

The erroneous jury instructions (now that we have the benefit of hindsight per *Mullaney v. Wilbur*) strewn throughout our Maryland experience have sometimes taken the form, "In the absence of justification or excuse, all intentional homicide will be presumed to have been with malice," or its equivalent, "All intentional and unlawful [thereby excluding justifiable and excusable] homicide will be presumed to be with malice." In these qualified forms,

---

serious bodily harm (form one of implied malice) — and not with the less typical "malicious" intents—3) depraved heart murder (form two of implied malice) and 4) felony-murder (form three of implied malice). Since a passionate and hot-blooded response to a legally adequate provocation triggers an intentional killing or an intentional doing of grievous bodily harm (and is, therefore, voluntary rather than involuntary manslaughter), it is, by definition, an ameliorated form only of 1) or 2) above and not of 3) or 4), which do not involve intentional killing or intentional doing of grievous bodily harm at all. The entire issue of provocation and the now unconstitutional presumption which negates it involve, therefore, only the more common forms of second-degree murder and not the rarer forms. Where a conviction for murder in the second degree appears clearly to have been predicated upon the common law felony-murder doctrine or upon the depraved heart doctrine, it is difficult to imagine how provocation could be a legitimate issue in the case. Even an admittedly erroneous instruction presuming malice (by way of presuming non-mitigation), would appear under those circumstances to have been palpably immaterial.

the error has been limited to the now unconstitutional presumption of non-mitigation.

Frequently, however, the erroneous instructions were not even thus partially qualified and took the broader form, "All intentional homicide will be presumed to be with malice." In this totally unqualified form, the homicide is unconstitutionally presumed to be non-justified and non-excused as well as non-mitigated.

If a fair reading of the instructions indicates that the "presumption of malice," in that broader and unqualified form, operated to relieve the State of its burden of ultimate persuasion on the issue of non-justification and/or non-excuse (where either is a fair issue in the case), *Mullaney v. Wilbur* will require a reversal regardless of the degree of felonious homicide on which the conviction was had. Unlike the situation dealt with where the only issue in the case affected by the presumption was mitigation and the only advantage the defendant was denied was the possible lowering of murder in the second degree to manslaughter, the harm on the issues of presumed non-justification and presumed non-excuse operates across the entire spectrum of culpability. If the defendant had had the benefit of a fair allocation of the burden of persuasion on these issues, he might well have been found not guilty totally and not simply guilty to a lesser degree. Self-defense, for example, would relieve one of guilt for a premeditated and deliberated killing as well as for a killing in hot blood.[8]

Similarly, a verdict rendered in a court trial of guilt for any degree of felonious homicide will bear scrutiny under *Mullaney v. Wilbur* if the judge, in the course of rendering his decision, indicated that he relied in any way upon the now unconstitutional presumption of malice or that he in any way placed upon the defendant the burden of proving such justification or such excuse as would render him not

---

8. The inevitable application of the *Mullaney v. Wilbur* and *Winship* principle to so-called "affirmative defenses" generally, rather than simply to the narrow issue of the burden as to manslaughter, will be analyzed more fully in Part IIG *infra.*

guilty (justification or excuse fairly being an issue in the case).

F.  *Erroneous Allocation of the Burden of Persuasion as to Justification, Excuse or Mitigation Where None Is a Fair Issue in the Case*

As boiler-plate instructions have been handed down from judicial generation to judicial generation and solemnly intoned whether they have any bearing on the case then at bar or not,[9] there have been frequent occasions when erroneous jury instructions have been given but where the error has no conceivable relevance to any issue in the case.

As will be discussed more fully in Part IIH *infra*, before it can be said that there is in a case a legitimate jury issue on the question of justification, excuse or mitigation, there must be evidence sufficient to generate the issue. That evidence may be, but need not be produced by the defendant. It may be found in the State's own evidence. But whatever its source, unless there is evidence sufficient to generate a fair jury question (or to generate the issue in like manner in a court trial), there is no requirement that instructions in these regards even be given. Indeed, they are inappropriate.

Instructive in this regard is 40 Am.Jur.2d *Homicide* § 485, "Confining instructions to evidence," pp. 737-738:

> "It is elementary that instructions to the jury in relation to matters not put in issue by the proof adduced are unnecessary, and requests therefor are properly refused. Although instructions in a homicide case may state a correct principle of law, they ought not to be given if they are not based upon or conform with the issues raised or facts supported by the evidence. The court is not bound, and should not be bound, to instruct the jury

9.  Whenever a "canned" set of jury instructions is resorted to, the man behind the can has an all-too-frequent way of going intellectually onto "automatic pilot." Once the liturgy begins, it will drone on to its bitter end, running the full gamut of homicidal mental states, the immaterial as well as the material. The only saving grace about the typical "canned" instructions on the subject of homicide is that full half of the multitudinous errors are not remotely in the ball park of materiality.

respecting the abstract rules of the law of homicide, but only respecting the principles applicable to the evidence of killing in the case at bar, although the giving of an abstract instruction is a cause for reversal only when it is reasonably apparent that the jury has been misled.

. . .

Even though the malice engendered in the heart of the defendant must have been without legal justification or excuse in order that he be found guilty of murder in the first or second degree, yet where there is no evidence tending to show such justification or excuse, the court is not called upon to cover that matter in the instructions. It is held that in a homicide case in which there is no evidence raising or tending to prove the issue, the court need not instruct the jury on questions of self-defense, or of the insanity or intoxication of, the accused."

And see *Braunie v. State,* 105 Neb. 355, 180 N. W. 567.

The application of this general principle is clear when it comes to the specific issues of excuse (by way of an accidental killing), justification (by way of self-defense) and mitigation (by way of hot-blooded response to legally adequate provocation). "[I]f no testimony is introduced which tends to show that the killing was accidental, the court is justified in refusing to instruct the jury upon that hypothesis." 40 Am.Jur.2d *Homicide* § 514, "Defenses; Matters of Justification, Excuse, or Mitigation; Generally," p. 766; *Lewis v. State,* 96 Ala. 6, 11 So. 259. "Obviously, requested instructions on the law of self-defense should be refused if there is no evidence whatever tending to show that the defendant acted in self-defense. . . ." 40 Am.Jur.2d *Homicide* § 519, "Self-defense and defense of others," p. 774; *Hardy v. People,* 133 Colo. 201, 292 P. 2d 973; *Jenkins v. State* (Del. Sup.), 230 A. 2d 262; *Combs v. Commonwealth,* 196 Ky. 804, 246 S. W. 132; *State v. Morse,* 35 S. D. 18, 150 N.

W. 293; *Zunago v. State,* 63 Tex. Crim. 58, 138 S. W. 713; *State v. Brooks* (Mont.), 436 P. 2d 91; *State v. Anderson,* 207 Or. 675, 298 P. 2d 195. "[A]ccording to the general rule, the trial judge is under no duty to instruct the jury as to the various lower grades or degrees unless there is some direct, circumstantial, or inferential evidence tending to reduce the crime to one of the lower grades or degrees." 40 Am.Jur.2d *Homicide* § 525, "As to Grades and Degrees of Homicide; Generally," p. 782. "[I]f the undisputed facts show that the defendant did the killing, and there is no evidence of sufficient provocation by the deceased or of other mitigating or extenuating circumstances, which would reduce the crime to manslaughter, the court is not required to instruct upon manslaughter." 40 Am.Jur.2d Homicide § 530, "Failure to instruct as to lower grade or degree, where defendant is convicted of higher," p. 786; *Belton v. U. S.* (D.C. Cir.), 382 F. 2d 150; *Thomas v. State,* 126 Ala. 4, 28 So. 591. See also 4 *Warren on Homicide,* § 380, "Unnecessary and Inapplicable Instructions," p. 630.

Maryland has consistently held that instructions need not and should not be given on particular defenses unless and until there is evidence sufficient to generate a legitimate jury issue with respect to a particular defense. This Court has held that no instruction need be given on the degree of intoxication necessary to vitiate specific criminal intent and to lower homicidal *mens rea* from first degree to second degree, where the evidence, by whomsoever produced, is not legally sufficient to generate a legitimate jury issue in that regard. *Bateman v. State,* 10 Md. App. 630, 272 A. 2d 64; *Mock v. State,* 2 Md. App. 771, 237 A. 2d 811. We have held that an instruction should not be given on the subject of insanity where the evidence, by whomsoever produced, is not legally sufficient to generate a legitimate jury issue in that regard. *Bremer v. State,* 18 Md. App. 291, 315-316, 307 A. 2d 503; *Dennis v. State,* 13 Md. App. 564, 569, 284 A. 2d 256; *Strawderman v. State,* 4 Md. App. 689, 698, 244 A. 2d 888. We have held that an instruction should not be given on the subject of self-defense where the evidence, by whomsoever produced, is not legally sufficient to generate a

legitimate jury issue in that regard. *Street v. State*, 26 Md. App. 336, 338-341, 338 A. 2d 72. We have held that an instruction should not be given on the defense of entrapment where the evidence, by whomsoever produced, is not legally sufficient to generate a legitimate jury issue in that regard. *Fisher v. State*, 28 Md. App. 243, 345 A. 2d 110.

When a defendant has then no right even to take an issue before the jury, any instruction on such an issue (erroneous or not) is more than he is entitled to. When any consideration of an issue by the fact finder (court or jury) would properly be totally foreclosed, the defendant cannot complain that the issue was submitted under an unduly heavy burden upon him, since he has, even in that event, received more than he deserved. To carry an undue burden of persuasion may be a critical handicap to one legitimately in a race; it is no handicap at all when one is not entitled to run in the race.

The general law is well stated at 5 Am.Jur.2d *Appeal and Error* § 811, "Facts in issue; materiality," p. 253: "[A]ny errors in instructions which are expressly confined to issues . . . which are immaterial, or on facts not in issue . . . are generally harmless." In *Street v. State, supra*, the jury was instructed that the defendant had the burden of proving self-defense by a preponderance of the evidence. The Court went further and actually directed a verdict against the defendant on this subject. With respect to the innocuousness of even an erroneous instruction on an issue not fairly in the case, we said, at 26 Md. App. 340-341:

> "It is clear the appellant in this case was not entitled to have the issue of self-defense considered by the jury. Consequently, the instruction of the trial court advising the jury not to consider the element of self-defense, even if improper, was not reversible or prejudicial error. . . ."

The Court of Appeals dealt with a similar situation in *O'Connor v. State*, 234 Md. 459, 199 A. 2d 807. A jury had there been charged that the ultimate burden of persuasion was upon a defendant to prove his insanity by a

preponderance of the evidence. The Court concluded that the correctness or incorrectness of the instruction was immaterial since it bore upon an issue which was not properly generated in that case. It said, at 234 Md. 461:

> "The State contends that the instruction was correct, but argues that even if it was not there was no reversible error because the defense produced no evidence of insanity sufficient to overcome the presumption of sanity.... Hence the State contends there was legally insufficient evidence to warrant the submission of this issue to the jury. Upon a careful review of the evidence, we agree."

See also *Jenkins v. State,* 238 Md. 451, 465-466, 209 A. 2d 616, *vacated on other grounds,* 383 U. S. 834, 86 S. Ct. 1237, 16 L.Ed.2d 299.

Erroneous instructions on non-issues are self-evidently immaterial.

## II. The Ghost of Homicide Future

Of far greater significance is the impact of *Mullaney v. Wilbur* and *Winship* upon the future. Some of our law is squarely unconstitutional. Much of it is questionable but salvageable, if only an antiquated and treacherously ambiguous vocabulary could be trimmed away from it. One thing is clear: it needs to be resurveyed in light of *Mullaney v. Wilbur.*

### A. *The Mullaney v. Wilbur Decision Itself*

The immediate issue before the Supreme Court was the requirement that a defendant charged with felonious homicide in Maine "prove that he acted 'in the heat of passion on sudden provocation' in order to reduce the homicide to manslaughter." 44 L.Ed.2d at 511. The Supreme Court was called upon to decide whether that requirement of Maine law comported "with the due process requirement, as defined in *In re Winship* ... that the prosecution prove

beyond a reasonable doubt every fact necessary to constitute the crime charged." *Ibid*.

The evidence was undisputed that Wilbur had fatally assaulted one Claude Hebert in the latter's hotel room. There were no witnesses to the crime other than Wilbur himself, who did not take the stand at his trial. Introduced against him was his confession acknowledging his homicidal agency. In the course of that confession, however, Wilbur had claimed "that he had attacked Hebert in a frenzy provoked by Hebert's homosexual advance." *Ibid*. The alternative theory of the defense (the theory which was ultimately pertinent) was that "at most the homicide was manslaughter rather than murder, since it occurred in the heat of passion provoked by the homosexual assault." Pp. 511-512.

The Maine law on homicide, under review by the Supreme Court, bore remarkable similarity to the Maryland law on that subject.[10] As summarized by the Supreme Court, Maine recognized that certain elements are common to all felonious homicide — both murder and manslaughter. Those elements are that the homicide 1) be unlawful, that is, that it be neither justifiable nor excusable, and 2) be intentional. The State is required to prove these elements beyond a reasonable doubt. Only upon proof of them would a Maine trial court go on to consider the further distinction between murder and manslaughter. It did go on to consider that further distinction in the trial of Wilbur.

In language ominously familiar to Maryland ears, the Maine court defined murder and manslaughter. It pointed out that "Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder . . ." P. 512, n. 3. It further pointed out that "Whoever unlawfully kills a human being in the heat of

---

10. It, to be sure, did not divide murder into degrees. That, however, is not a pertinent difference in terms of analyzing the impact of *Mullaney v. Wilbur* upon Maine or Maryland law, since the critical procedural battle was and is along the demarcation line that separates manslaughter from murder and not along the line separating one degree of murder from another, which line does not have the procedural pitfalls involved in "inferring malice" or "presuming malice" and/or casting the burden upon a defendant to move downward across that line.

passion, on sudden provocation, without express or implied malice aforethought [is guilty of manslaughter] . . ." *Ibid.* The Maine trial court further charged that " 'malice aforethought is an essential and indispensable element of the crime of murder' . . . without which the homicide would be manslaughter." P. 512.

The Maine trial court then moved on to the constitutionally significant nub of the instruction. As found by the Supreme Court, it told the jury that "if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." *Ibid.* The trial court pointed out that "malice aforethought and heat of passion on sudden provocation are inconsistent things" and that "by proving the latter the defendant would negate the former and reduce the homicide from murder to manslaughter." *Ibid.* The court then defined "heat of passion" and "sudden provocation" in constitutionally inoffensive terms.

Wilbur was convicted of murder and predicated his appeal, first to the Maine Supreme Judicial Court and then to the Supreme Court of the United States,[11] upon the proposition that "he had been denied due process because he was required to negate the element of malice aforethought by proving that he had acted in the heat of passion on sudden provocation." p. 513. He claimed that by allowing the jury to presume non-mitigation — the sole element of "malice" distinguishing murder from manslaughter — the prosecution had been relieved of its burden under *Winship* "to prove the existence of that element beyond a reasonable doubt." *Ibid.*

The Supreme Court cleanly isolated the issue before it:

> "The Maine law of homicide, as it bears on this case, can be stated succinctly: Absent justification

---

11. With intermediate stops at the Federal District Court and the United States Court of Appeals for the First Circuit, which need not concern us here.

or excuse, all intentional or criminally reckless killings are felonious homicides. Felonious homicide is punished as murder ... unless the defendant proves by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter. ... The issue is whether the Maine rule requiring the defendant to prove that he acted in the heat of passion on sudden provocation accords with due process." 44 L.Ed.2d at 515.

The *Mullaney v. Wilbur* decision went on to trace and to analyze incisively the development of the common law of felonious homicide, the splitting of that crime into the separate crimes of murder and manslaughter, and the procedural devices that emerged to move culpability upward or downward between the two. It reaffirmed the undergirding tenet of *In re Winship* that the prosecution must, under the Due Process Clause, prove beyond a reasonable doubt each and every element necessary to establish guilt and/or necessary to enhance punishment. The ultimate holding of the Court, as applied to the Maine conviction before it, was clear:

"Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can be given a life sentence when the evidence indicates that it is *as likely as not* that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S., at 372 (concurring opinion). We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden

provocation when the issue is properly presented in a homicide case." 44 L.Ed.2d at 522.

## B. *A Reader's Guide to Mullaney v. Wilbur*

Although a very narrow reading of *Mullaney v. Wilbur* could conclude that it dealt only with instructions, in a jury trial, on the subject of the allocation of the burden of proof on the question of "heat of passion on sudden provocation" in a case where the issue before the jury was whether a guilty verdict should be for murder or only for manslaughter, such would be a grudging and unduly restrictive reading of this groundbreaking decision. A fairer reading makes it clear that what is involved is the broader question of the allocation of the burden of persuasion where a wrongful allocation of that burden will operate to relieve the State of its obligation under the Due Process Clause, as interpreted by *Winship*, to prove each and every element of a criminal offense beyond a reasonable doubt. This goes beyond the limited defense of mitigation and it goes beyond the limited confines of jury instructions.

Particularly in reaching out for the broader import, a mere surface reading will not suffice. In writing for the Court, Justice Powell, as is his wont, produced a thoroughly researched and well-crafted opinion. His analysis is articulate and his logic is impeccable. Notwithstanding these qualities, the opinion stands for far more than it can say — it is but the tip of an iceberg above the waterline. Justice Powell refers in his footnotes to a qualitatively and quantitatively rich reservoir of superb source materials.[12]

---

12. Upon the history and development of murder at the common law, the opinion draws heavily upon the Supreme Court's earlier decision in *McGautha v. California*, 402 U. S. 183, 91 S. Ct. 1454, 28 L.Ed.2d 711 (1971); 3 Stephen, *A History of the Criminal Law of England*, 1-107 (1883); 2 Pollock and Maitland, *History of English Law*, 478-487 (2d Ed. 1909); *Perkins on Criminal Law* (2d Ed. 1969); LaFave and Scott, *Criminal Law* (1972) (the best analysis to appear since Professor Perkins first wrote on the subject in 1957); Perkins, *A Re-examination of Malice Aforethought*, 43 Yale L. J. 537 (1934); Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder*, 87 U.Pa.L.Rev. 759 (1949); Wechsler and Michael, *A Rationale of the Law of Homicide*, 37 Col.L.Rev. 701 (1937).

Upon the legitimacy of certain inferences and presumptions, the Court

Some of these are deep and intellectually groundbreaking academic efforts which mark analytical breakthroughs in our understanding of the law — particularly in the troubled field of presumptions and their collision with the Due Process Clause. Although they can be little more than alluded to in an opinion that stops short of book-length, a reading of them makes it apparent that they animate and undergird all that appears on the surface of the *Mullaney v. Wilbur* opinion itself. For a thorough appreciation of *Mullaney v. Wilbur* and its unmistakable import for the future, it is indispensable to read and to digest the underlying sources that breathe through its every pore.

## C. *The Common Law's Tower of Babel*

In looking to the impact of *Mullaney v. Wilbur* and *Winship* upon Maryland's homicide law, one fixed star of reference must be kept constantly in mind. These cases are concerned exclusively with due process, the modality or process by which we do certain things in the criminal law. They are concerned with the criminal law's procedures and not with its substance. It is, therefore, not the definitions or elements of our various grades of felonious homicide that require scrutiny under *Mullaney v. Wilbur* and *Winship*, but rather our mechanical, evidentiary and procedural devices. The ultimate concern here is not with what we do but with

---

looked to its own earlier decisions in *Davis v. United States*, 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1895); *Tot v. United States*, 319 U. S. 463, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943); *United States v. Gainey*, 380 U. S. 63, 85 S. Ct. 754, 13 L.Ed.2d 658 (1965); *Leary v. United States*, 395 U. S. 6, 89 S. Ct. 1532, 23 L.Ed.2d 57 (1969); *Turner v. United States*, 396 U. S. 398, 90 S. Ct. 642, 24 L.Ed.2d 610 (1970); *Barnes v. United States*, 412 U. S. 837, 93 S. Ct. 2357, 37 L.Ed.2d 380 (1973).

Perhaps the most significant academic input into the decision came from the thorough-going analyses of the function of presumptions: Fletcher, *Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases*, 77 Yale L. J. 880 (1968); Ashford and Risinger, *Presumptions, Assumptions and Due Process in Criminal Cases: A Theoretical Overview*, 79 Yale L. J. 165 (1969); Comment, *Due Process and Supremacy as Foundations for the Adequacy Rule: The Remains of Federalism After Wilbur v. Mullaney*, 26 Me.L.Rev. 37 (1974); Note, *The Constitutionality of the Common Law Presumption of Malice in Maine*, 54 B.U.L.Rev. 973 (1974). And, more generally, Packer, *The Limits of the Criminal Sanction* (1968).

how we do it. We will look then to our procedural devices and to the subversion of those devices over the decades by a shifting and unreliable vocabulary.

Unlike simpler crimes with a single *mens rea,* felonious homicide has over the centuries developed a broad spectrum of more or less blameworthy mental states. To move backward and forward along that continuum between the least culpable and the most culpable ends of the band, the common law invented a series of procedural devices — presumptions (true and so-called), inferences and burdens of proof (both of going forward with the evidence and of ultimate persuasion). The devices, which might have had great utility if carefully employed, have produced instead a juridical madhouse — a linguistic hall of mirrors where meaning and direction are endlessly shifting — primarily because different devices with different functions have been cursed with the same name.

A journey through the case law in search of clear and consistent meaning can only be described as Kafkaesque. Where terms such as "malice implied," "malice presumed" and "malice inferred" are employed with phantasmagoric interchangeability, the case law is a semanticist's nightmare. It is as if the word "knife" could connote either a surgeon's scalpel or a butcher's ax. Court A describes a delicate operation using a "knife" (meaning thereby a surgeon's scalpel). Court B attempts meticulously to follow the teaching of Court A but is doomed to inevitable disaster because the word "knife" means to it, a butcher's ax.

The analogy is not farfetched. In our procedural vocabulary, two words or phrases are particularly contagious spreaders of confusion — "burden of proof" and "presumption". "Burden of proof" connotes two very different things:

1) *the burden of ultimate persuasion (the risk of nonpersuasion); and*

2) *the burden of producing some evidence (the risk of dismissal and/or the risk of not getting an issue before the jury).*

All too frequently, the phrase is employed in both jury instructions and in our case law without a clear differentiation as to which meaning is attached to the phrase on a particular occasion. All too frequently, it appears that the user was not even aware of the distinction. When the user (opinion writer or jury instructor) is not even aware of the ambiguity, the recipient of the message (the opinion reader or the jury) cannot possibly receive a clear and unambiguous message.

The culprit "presumption" is even more protean in its myriad manifestations. It connotes five very different things:

1) *a mere statement as to who has and what is the burden of persuasion (e.g., the "presumption of innocence"* [13] *);*

---

13. The "presumption of innocence" is, of course, not a presumption at all. 9 *Wigmore on Evidence* (3rd Ed. 1940), § 2511, points out at p. 407, "[T]he 'presumption of innocence' is in truth merely another form of expression for a part of the accepted rule for the burden of proof in criminal cases, *i.e.* the rule that it is for the prosecution to adduce evidence . . . and to produce persuasion beyond a reasonable doubt. . . ." Thayer, *Preliminary Treatise on Evidence* (1898), is equally clear, at p. 551, "In the first place, the so-called presumption of innocence is not, strictly speaking, a presumption in the sense of an inference deduced from a given premise. It is more accurately an assumption which has for its purpose the placing of the burden of proof upon anyone who asserts any deviation from the socially desirable ideal of good moral conduct." And see Morgan, *Basic Problems of Evidence* (1962), p. 44.

If the "presumption of innocence" were a true presumption of law or permitted inference of fact, it would be flagrantly unconstitutional under *Leary v. United States, supra,* and other cases requiring that a presumption be based upon a mathematical probability that it be true. Quite the reverse likelihood, of course, applies to one arrested, indicted and brought to trial. As McCormick, *The Law of Evidence* (1954), astutely pointed out, at 647-648: "[W]hen it came to be employed, in argument and in instructing juries, in criminal trials under the common law, it became a source of mysticism and confusion. As applied to the accused, any assumption, or 'presumption' of innocence, in the popular sense of an inference based on probability, is absurd. The probability is the reverse. The assumption of innocence which is reasonable in the absence of contrary facts becomes quite unrealistic when we include in the picture the facts that the person has been officially charged with the crime and has been brought to trial. Nevertheless, the phrase 'presumption of innocence' has been adopted by judges as a convenient introduction to the statement of the burdens upon the prosecution, first of producing evidence of the guilt of the accused and, second, of finally persuading the jury or judge of his guilt beyond a reasonable doubt."

2) *a rule of substantive law (a conclusive presumption* [14] *)*;

3) *a permitted inference of fact (e.g., the so-called "presumption" that the possessor of recently stolen goods is the thief)*;

4) *a presumption of law, or true presumption, in the Morgan tradition of shifting the burden of ultimate persuasion and entailing either a directed verdict or a jury instruction*; and

5) *a presumption of law, or true presumption, in the Thayer-Wigmore tradition of something which shifts only the burden of going forward with evidence and which totally dissipates or disappears from the case once that burden is met (the "bursting bubble" concept)*.

All too frequently, no differentiation is made as to which of these five distinct meanings is attached to the word "presumption" on a particular occasion. When the same word or phrase means one thing to the writer or speaker and something quite different to the reader or hearer, communicative chaos is inevitable.

This treacherous procedural vocabulary has been superimposed upon an equally treacherous definitional vocabulary, which describes the elements of the various degrees of blameworthiness in now anachronistic terms which have, over the centuries, lost their original meaning and become terms of art totally divorced from common usage. The prime culprit, in this regard, is "malice." It is not

---

**14.** As to the real character of the so-called "conclusive presumption," see 9 *Wigmore on Evidence*, § 2492, "Conclusive Presumptions," p. 292: "In strictness, there cannot be such a thing as a 'conclusive presumption.' Wherever from one fact another is said to be conclusively presumed, in the sense that the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule is really providing that, where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of the proponent's case; and to provide this is to make a rule of substantive law, and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with evidence. . . . The term has no place in the principles of Evidence . . . and should be discarded." See also McCormick, *op.cit.*, pp. 639-640; Thayer, *op.cit.*, pp. 317-319.

a single notion but an "umbrella term" encompassing three distinct aspects. It connotes:

1) *that the act which produces the homicide be intentional;*[15] and

2) *that the act be without justification or excuse;* and

3) *that the act be unmitigated.*

The root problem is that we use the undifferentiated "umbrella term" when we are sometimes referring only to one of its three aspects. Certain procedural devices which are constitutionally appropriate in establishing one aspect of "malice" happen to be unconstitutional with respect to the establishment of other aspects of "malice."

The heart of the problem is the far-from-consistent interaction of the two meanings and functions of "burden of proof" and the five meanings and functions of "presumption" with the three aspects of "malice." This haphazard interaction has produced some results which must now be recognized as unconstitutional and many other results which are chaotic even short of being unconstitutional. *Mullaney ɔ. Wilbur* has not created the problem; it has simply spotlighted the problem.

We must cull out our procedures which are unconstitutional. In the process, we should also identify the linguistic baggage which is now totally outdated, serves no present purpose, only encumbers us by its presence and ought to be forthwith discarded. The season is at hand for a systematic linguistic housecleaning. Although one could program a survey of our homicide law by tracing its historical development or, alternatively, by proceeding through it from its most culpable degree through its least

---

**15.** We have deliberately not said that the "killing" must be intentional, since that applies to only one of the mental states constituting malice. There are, of course, other malicious states of mind where the "killing" is unintentional. What is there intended is some other equally "malicious" act such as doing grievous bodily harm, doing a life-endangering thing in such wanton manner as to evidence a "depraved heart" or perpetrating a life-endangering felony.

culpable degree, the most appropriate route of survey will probably be, in light of *Mullaney v. Wilbur's* concern with procedural devices, an examination of the various employments of that Hydra-headed monster: "Presumption."

D. *Head One of the Hydra: A Mere Statement as to the Burden of Proof*

Remarkably, the jury instructions on homicide which come before us for review frequently contain the sentence, "All murder will be presumed to be murder in the second degree."[16] It is as likely as not that such a sentence is simply a slip of the tongue and that what was intended was some other sentence such as, "All felonious homicide will be presumed to be murder in the second degree," or, even more broadly, "All homicide will be presumed to be murder in the second degree." With the speaker's attention being drawn to the predicate of the sentence, ". . . will be presumed to be murder in the second degree," there may well have been careless indifference to whether the subject of the sentence was "Murder," "Felonious homicide," or "Homicide." [17] Assuming, however, that the sentence is sometimes literally intended, it is constitutionally unoffending.

Such a statement is, of course, no presumption at all. It is simply a circuitous and roundabout way of saying that the burden is upon the State of proving beyond a reasonable doubt all elements that go to make up murder in the first degree. As a purely redundant restatement of a burden already naturally upon the State, it is a statement that

---

**16.** Precisely such a jury instruction was before us in *Carroll v. State,* 11 Md. App. 412, 274 A. 2d 677. Although we discussed this so-called "presumption" in passing at 11 Md. App. 418-422, the decision went off on other grounds. And see the jury instruction dealt with by us in *Shotkosky v. State,* 8 Md. App. 492, 507, 261 A. 2d 171.

**17.** We have not been immune ourselves from the sometimes unconscious linguistic slippage from "felonious homicide" to "murder." See, for example, *Wilkins v. State,* 16 Md. App. 587, 608, 300 A. 411, where we said, "Once the State has shown beyond a reasonable doubt that a *felonious homicide (i.e., murder)* has been committed. . . ." (Italics added) "Felonious homicide" is, of course, not necessarily "murder" but is rather "murder *or* manslaughter."

behaves exactly like the statement having to do with "the presumption of innocence."

There are good reasons, however, for studiously avoiding any such statement as, "All murder will be presumed to be murder in the second degree."[18] It is, in the first place, a very roundabout and indirect way of saying something about the burden of proof which could be said much more simply and directly. In the second place, it has the potential for generating confusion in two regards. Although a merely innocuous statement about, "All murder being presumed . . .," it may too easily be misunderstood to be a statement about, "All felonious homicide being presumed . . ." or "All homicide being presumed . . ." In the second place, the misuse of the word "presumed" has its own potential for confusing, since this is not a case where anything is "presumed." Although less than unconstitutional, the statement ought to be avoided at all costs.

We would, however, make it absolutely clear that our criticism with existing practice in this regard is only with the misuse of the word "presumption" and not with the proper emphasis placed by such instructions upon the heavy burden of the State to prove the special elements of first-degree murder beyond a reasonable doubt. A defendant continues to be entitled to a jury instruction emphasizing the undisputed legal truth that mere proof even of *murder* will not give rise to an automatic permissible inference of deliberation or premeditation. If the jury is in a state of doubt or equipoise as to the establishment of the

---

**18.** Even as an innocuous statement as to burden of proof, it is not universally true. It is true enough with respect to "intent to kill" murder but is simply not true with respect to felony-murder, where the underlying felony happens to be arson, other burning, rape, sodomy, mayhem, robbery, burglary, kidnapping, storehouse breaking, daytime housebreaking or escape. In those cases and when the State proceeds on the felony-murder theory, the very act of proving murder generally also proves first-degree murder specifically, with no additional element needing to be shown. Granted the appropriate underlying felony, the "presumption" (if one insists upon calling it that) would operate in the other direction and "presume" all such murder to be murder in the first degree and, indeed, would "presume" it conclusively. This point is made simply to emphasize the inappropriateness of referring to a statement about the State's burden of proof in certain circumstances in terms of an all-embracing "presumption."

aggravating elements, the defendant is entitled to an assumption that the murder is only in the second degree. The jury should be told that the burden is upon the State of proving every aggravating element beyond a reasonable doubt and that in the absence of such proof by such a standard, guilt must be assumed to be only at the lower level.

Our only point in this regard is that the vocabulary is rich enough to find words to describe this heavy burden upon the State without resorting to a misuse of that procedural word of art "presume," which, to avoid future confusion, should be restricted to its technically proper role of describing a *shifting* of a burden. *The burden* to prove murder in the first degree *begins* with the State *and* always *remains* upon the State; it never *shifts*. A defendant will continue, therefore, to be entitled to the "assumption" that all *murder* is only murder in the second degree. That perfectly valid "assumption," however, should not be misnamed a "presumption."

## E. *Head Two of the Hydra: A Statement of Substantive Law*

*Mullaney v. Wilbur* does not affect any of our rules of substantive law — only our procedures. The pitfall of possibly overapplying *Mullaney v. Wilbur* is lurking in our path, however, because some of what are now substantive rules began their careers as legitimate procedural devices or as seemingly necessary legal fictions and only slowly hardened into conclusive presumptions (or rules of substantive law) over the centuries. Some other present substantive laws give the deceptive appearance of having traveled that evolutionary route. Three situations which now involve solid substantive law, and are not remotely procedural in nature, merit discussion.

### 1. *The Less Common Forms of First-Degree Murder*

By the clear direction of Maryland statute, murder in the first degree is, by definition, any of the following:

    a. All murder which shall be perpetrated by means of poison (Art. 27, § 407);

b. All murder which shall be perpetrated after lying in wait (§ 407);

c. Any kind of wilful, deliberate and premeditated murder (§ 407);

d. All murder committed in the perpetration of, or attempt to perpetrate, any arson (§ 408);

e. All murder committed in the burning or attempted burning of any barn, tobacco house, stable, warehouse or other outhouse having therein any tobacco, hay, grain, horses, cattle, goods, wares or merchandise (§ 409);

f. All murder committed in the perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, kidnapping, storehouse breaking, daytime housebreaking or escape (§ 410).

The difficulty is that of all of the forms of first-degree murder listed above, one of them—c.: "wilful, deliberate and premeditated killing"—has quantitatively so dominated the literature and the case law as to be taken for the norm, if not indeed for the universal statement of the offense. Our law, therefore, frequently makes statements that apply to that one form of first-degree murder alone but does so in unqualified and overly broad terms that seem to be universal truths rather than statements of simply limited utility. It is not unusual to find in our case law such seemingly universal statements as ". . . in order for the State to elevate the crime to first degree murder it must show that the killing was wilful, deliberate, and premeditated." *Wilson v. State,* 261 Md. 551, 563, 276 A. 2d 214. In the factual context of its own case, the statement (and numberless ones like it) was unquestionably correct. The danger of its unqualified language, however, is that it is leading the overly zealous *Mullaney v. Wilbur* addicts into the ready trap of looking upon all other varieties of first-degree murder as constitutionally suspect shortcuts to a finding of "wilfulness, deliberation and premeditation." They read into certain felony-murder convictions, for

instance, an unconstitutional relieving of the State of some postulated burden, under the Due Process Clause, of proving the special *mens rea* spelled out in the latter part of § 407. There is, of course, no such proof required.

What are now §§ 407-410 were taken directly from § III of Chapter 138 of the Acts of 1809, which for the first time separated murder in Maryland into degrees.[19] That act did not create a new crime but simply divided murder into two degrees for punishment purposes, leaving the common law definition of the crime of murder undisturbed. *Davis v. State*, 39 Md. 355. The desirability of some form of codification was twofold. That same Chapter 138 of the Acts of 1809 had, in § XI thereof, abolished benefit of clergy in Maryland. Theretofore, the more aggravated forms of murder had been non-clergyable, that is, capital. The less aggravated forms of murder were clergyable, that is, non-capital. With the abolition of the ameliorating device known as benefit of clergy, all murder would have become capital. The effect of § III of the Acts of 1809 separating murder into categories was to give us, in the form of the categories of first-degree murder and second-degree murder, the functional equivalents of the former categories "non-clergyable" and "clergyable," respectively.

To the extent to which certain of the less aggravated forms of murder were non-clergyable (and, thereby, capital) prior to the Acts of 1809, a second moving force was at work in Maryland. Pennsylvania had by its Act of 1794 moved to mitigate "the rigor of the common law by dividing murder into degrees," Moreland, *Law of Homicide* (1952), at 199-200. This reform movement spread from Pennsylvania to seven other states, including Maryland. Moreland, *op.cit.*, at 204-205; Note, *The Developing Law of Intentional Murder in Maryland*, 13 Md.L.Rev. 327 (1953). What is now § 407 of our

---

**19.** Other than dividing the provisions of § III of the 1809 act into separate sections, there has not been a single change in the definition of first-degree murder in the intervening 166 years, with the single exception that the felonies of kidnapping, storehouse breaking, daytime housebreaking and escape have been added to what is now § 410.

law was taken virtually verbatim from the Pennsylvania Act of 1794.[20]

In spelling out the crimes which, because of "the degree of their atrociousness," would be first degree and, therefore, capital (the formerly non-clergyable category), § III gave us what has been our law ever since:

> "AND, whereas the several offences which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment, therefore, BE IT ENACTED, That all murder which shall be perpetrated by means of poison, or by lying in wait, or by any kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate, any arson, or to burn any barn, tobacco-house, stable, warehouse, or other out-house, not parcel of any dwelling-house, having therein any tobacco, grain, hay, horses, cattle, or goods, wares and merchandize, rape, sodomy, mayhem, robbery or burglary, shall be deemed murder of the first degree; and all other kind of murder shall be deemed murder of the second degree. . . ."

The other forms of first-degree murder, albeit perhaps less common, are not mere pale reflections of wilful, deliberate and premeditated killing. They stand upon their own feet as self-sufficient definitions of murder in the first degree. Their own sets of circumstances do not constitute first-degree murder because wilfulness, deliberation and premeditation may somehow be inferred, presumed or implied, but because such wilfulness, deliberation and premeditation are irrelevant considerations and are flatly superfluous. A poisoning, for example, could be sudden and

---

**20.** See generally Wechsler and Michael, *A Rationale of the Law of Homicide,* 37 Col.L.Rev. 701, 704-705 (1937). And see Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U. of Pa.L.Rev. 759 (1949).

spontaneous rather than deliberate and premeditated, and yet constitute murder in the first degree. Although it is difficult to hypothesize, a killing by lying in wait need not, of necessity, be deliberate and premeditated in order to constitute murder in the first degree.[21] In most of these other forms of first-degree murder, it is the particular *actus reus*,[22] the dreaded modality or means of the murder,

---

**21.** Indeed, killing from ambush or while lying in wait is far more ancient than premeditated killing as the object of our deepest opprobrium. Murder was originally a secret killing by waylaying of the newly arrived Norman conquerors at the hands of the native and subjugated Saxons. The ghost of this secret ambush still animates our notion of the highest degree of guilt. Such secret killings were particularly vexing to the Crown and difficult to suppress. To crush the evil, an entire hundred (a local administrative unit) was held responsible whenever a Norman was found slain by an unknown hand. The hundred was subjected to a heavy fine or amercement called the *murdrum*. In 1340, almost 300 years later when all Normans had long since become Englishmen, the *murdrum* was finally abolished, but the term "murder" lived on to connote the worst kind of homicide. Pollock and Maitland, *History of English Law* (2d Ed. 1911) at 486-487; Moreland, *Law of Homicide* (1952), at 9, 198-199.

Yet a second variety of what is today first-degree murder antedates significantly a deliberated and premeditated killing. In the early 1600's, Lord Coke speaks in his *Third Institute* of felony-murder. It is well established by the time of Sir Matthew Hale's *History of the Pleas of the Crown* (1736), being referred to at 1 *Hale P.C.* 465-467. The doctrine is referred to as well-established law in Foster, *Crown Law* (2nd Ed. 1791), at 258-259; 1 *Hawkins Pleas of the Crown* (8th Ed.), at 86, 100; 4 *Blackstone's Commentaries* (1765), at 200-201; 1 East, *Pleas of the Crown* (1806), at 255-260. And see generally Moreland, *Law of Homicide* (1952), at 42-54.

By way of contrast, the phrase "deliberate and premeditated" is very much of a late starter in the murder field, tracing back only to the Pennsylvania Act of 1794, whence it came into Maryland law in 1809. Even allowing for the fact that the word "premeditated" was simply an attempt to revivify the original meaning of "malice aforethought" or "malice prepensed," even those notions date only to the period 1496-1547, when a series of early Tudor statutes excluded from the benefit of clergy the more serious forms of felonious homicide, referring to them as murder committed with "malice prepensed." 12 Hen. VII, c. 7 (1496); 4 Hen. VIII, c. 2 (1512); 23 Hen. VIII, c. 1, §§ 3, 4 (1531); 1 Edw. VI, c. 12, § 10 (1547).

**22.** By the phrase *actus reus* we mean, of course, the harmful act, by way of contrasting it with the *mens rea* or guilty mind. Both phrases are taken originally from Lord Coke, 3 *Institutes* 107: "*Actus non facit reum nisi mens sit rea*": "The act does not make [one] guilty unless his mind be guilty." Professor Perkins uses the phrase in this sense, pointing out that it was earlier used by Kenny, *Outlines of Criminal Law* (15th ed. 1936), 45, 50, 75, 91, etc. See Perkins, *Criminal Law* (1st ed. 1957), 652-654, particularly at 654:

> "What has been said emphasizes the fact that there are two components of every crime: One of these is objective, the other is subjective; one is physical, the other is psychical; one is the *actus reus*, the other is the *mens rea*."

which we have singled out for our gravest criminal sanction and not a particular *mens rea*. In the various felony-murders listed in §§ 408, 409 and 410,[23] no intent to kill is even necessary, let alone a deliberated and premeditated intent. *Lynch v. State,* 9 Md. App. 441, 265 A. 2d 283; *Wiggins v. State,* 8 Md. App. 598, 261 A. 2d 503; *Parker v. State,* 7 Md. App. 167, 254 A. 2d 381.[24]

These other varieties of first-degree murder are separate and equal combinations of circumstances invoking our highest penalty and not simply means of establishing wilfulness, deliberation and premeditation. They have rather been designated by statute as independently self-sufficient conditions to constitute murder in the first degree. They are, therefore, not remotely affected by anything in *Mullaney v. Wilbur.*

## 2. The Doctrine of Transferred Intent

There is a second rule of substantive law which is totally unaffected by anything in *Mullaney v. Wilbur* but which may, at first glance, appear to be vulnerable simply because the word "transferred" seems to indicate that some

---

**23.** It is sometimes falsely asserted that §§ 408-410 constitute felony-murder doctrine in Maryland. That is not true. The felony-murder doctrine (see Part II E 3 *infra*) is the common law rule — defining one of the at-least three varieties of implied malice — which raises a homicide resulting from the perpetration or attempted perpetration of a felony to the murder level generally. It is only at that point, after the felony-murder rule has already operated, that §§ 408-410 come into play to provide further that in the case of certain designated felonies, the *already established murder* shall be punished as murder in the first degree.

Only one state, incidentally — Ohio — fails to recognize the felony-murder doctrine. Moreland, *Law of Homicide* (1952), at 49. For good Maryland discussions of felony-murder, see *Stansbury v. State,* 218 Md. 255, 146 A. 2d 17, and *Wood v. State,* 191 Md. 658, 62 A. 2d 576.

**24.** Thus, the intoxication which can sometimes negate a specific intent or special *mens rea* and reduce first-degree to second-degree murder would have no such extenuating effect when the first-degree murder is predicated upon a special *actus reus* — poisoning, lying in wait or perpetrating one of the felonies designated in § 408, 409 or 410 — instead of a special *mens rea*, *unless the underlying actus reus* itself requires a specific intent or special *mens rea* beyond the general intention of doing the underlying act. "When proof of specific intent to kill is eliminated any defense on that particular issue is also barred." Clark and Marshall, *Law of Crimes* (6th Ed., Wingersky Revision, 1958), at 562; *Stansbury v. State,* 218 Md. 255, 259-260, 146 A. 2d 17.

procedural device is at work. This is the doctrine of transferred intent. This ancient rule of the common law that if A, with requisite malice, aims a deadly weapon at B, misses B and hits C (an unintended victim), the killing of C will nonetheless constitute murder, is now firmly established as part of the common law of Maryland. *Gladden v. State,* 273 Md. 383, 330 A. 2d 176, *aff'g* 20 Md. App. 492, 316 A. 2d 319. In earlier evolutionary stages, a legal fiction or a procedural device may have been at work. It is now clearly recognized, however, that what is involved is simply a rule of substantive law that the *mens rea* of murder as to anyone coupled with the *actus reus* of a homicide is sufficient to constitute the crime of murder. As long as the *mens rea* and the *actus reus* correspond in time, there is no requirement that the *mens rea* be directed specifically at the actual victim. The modern and better explanations of the doctrine point out the inappropriateness of the word "transferred" in the earlier case law.

Perkins, *Criminal Law* (2d Ed. 1969) makes it plain that to speak of "transferring the malice" was simply "to offer an unsound explanation . . . to support a very sound conclusion," saying at 826:

"If, without justification, excuse or mitigation, D with intent to kill A fires a shot which misses A but unexpectedly causes the death of B, D is guilty of murder. To speak of transferring the malice from A to B is merely to offer an unsound explanation (carried over from the law of torts) to support a very sound conclusion. The proper explanation is that D is guilty of murder in such a case because all elements of the offense are present, with mention if it seems necessary of the fact that as a crime the wrong was committed against the state. An intent to commit homicide without justification, excuse or mitigation, is malice aforethought; D had such an intent and therefore had malice aforethought; an act done by D with this malice aforethought caused the death of another — and hence D has committed

homicide with malice aforethought, which is murder by definition."

To a similar effect is LaFave and Scott, *Criminal Law* (1972), at 253, pointing out that the right result is reached but that the earlier "sort of reasoning is, of course, pure fiction":

> "These proper conclusions of law as to criminal liability in the bad-aim situation are sometimes said to rest upon the ground of 'transferred intent': To be guilty of a crime involving a harmful result to *C*, *A* must intend to do harm to *C*; but *A*'s intent to harm *B* will be transferred to *C*; thus *A* actually did intend to harm *C*; so he is guilty of the crime against *C*. This sort of reasoning is, of course, pure fiction. *A* never really intended to harm *C*; but it is not necessary, in order to impose criminal liability upon *A*, to pretend that he did. What is really meant, by this round-about method of explanation, is that when one person (*A*) acts (or omits to act) with intent to harm another person (*B*), but because of a bad aim he harms a third person (*C*) whom he did not intend to harm, the law considers him (as it ought) just as guilty as if he had actually harmed the intended victim. In other words, criminal homicide, battery, arson and malicious mischief do not require that the defendant cause harm to the intended victim; an unintended victim will do just as well."

The very thorough and scholarly opinion of Judge O'Donnell in *Gladden v. State, supra,* brought Maryland squarely into line not simply with the proper result but also with the more modern and more accurate explanation of that result, reasoning at 273 Md. 403-404:

> "Since murder is homicide committed with malice aforethought petitioner's argument would necessitate the engrafting of an ingredient that such homicide must be committed 'with malice

aforethought *against the deceased'* — an element never required under the common law.

. . .

Put another way, 'if one intends injury to the person of another under circumstances in which such a mental element constitutes *mens rea*, and in the effort to accomplish this end he inflicts harm upon a person other than the one intended, he is guilty of the same kind of crime as if his aim had been more accurate.' In such cases all the components of the crime are present. The psychical element which consists of a certain general mental pattern is not varied by the particular person who may be actually harmed."

Thus, as a purely substantive rule of law (despite its somewhat suspect name), the doctrine of transferred intent is not affected by anything in *Mullaney v. Wilbur.*

### 3. The Labyrinth of Implied Malice

There is a third body of law which is today clearly substantive but which, just as clearly, during earlier stages of its evolution went through the process of being a series of inferences and/or rebuttable presumptions slowly hardening into conclusive presumptions (or rules of substantive law) over the course of several centuries. This body of law deals with those several mental states constituting the *mens rea* of murder which we have grouped under the general label of "implied malice." To understand what is now meant by "implied malice," one must understand something of the development of the requirement of a particular mental state for a conviction for murder.

### a. The Mental State Generally

Felonious homicide at the early common law, tracing from earlier Norman and Saxon antecedents to that common law, did not look to the question of intent but imposed virtually

an absolute criminal liability for the killing of a human being.[25] By the middle of the 13th century, however, under the combined influence of Roman law (largely through the writings of Bracton), "which stressed the psychical element in criminal liability by emphasizing *dolus* and *culpa*," [26] and canon law, "with its persistent and relentless accent upon moral guilt," [27] the phrase *"mens rea"* began to take on significance in terms of ultimate criminal responsibility. The phrase *"mens rea"* had first appeared early in the 12th century [28] but grew in significance during the 13th.

During that 13th century, various mental states began to take on significance as they bore upon the question of moral blameworthiness. The earliest agency of amelioration in cases of the less blameworthy homicides was not an acquittal but rather a royal pardon as a matter of course. Already by the early 13th century, one who killed by misadventure or in self-defense or was a lunatic or an infant of tender years, while still technically guilty of homicide, was deemed deserving of a royal pardon, which pardons were consistently and regularly granted.[29] By the 14th century, homicide fell into four categories:

> "(1) justifiable homicide, a killing in pursuit of justice, which entitled the accused to an acquittal; (2) homicide committed through misadventure or in self-defense or by a lunatic or a child of tender years, in which cases pardons were consistently given; (3) murder,[30] indistinctly characterized as 'the worst kind of homicide,' punishable by death;

---

**25.** Moreland, *Law of Homicide* (1952), at 1-3; 2 Pollock and Maitland, *History of English Law* (2d Ed. 1911), at 451; 2 Holdsworth, *History of English Law* (3rd Ed. 1923), at 44; Sayre, *Mens Rea*, 45 Harv.L.Rev. 974, 977 (1932); Pollock, *English Law Before the Norman Conquest, 1 Select Essays in Anglo-American Legal History* (1907), at 88, 102.

**26.** Moreland, *op.cit.*, at 5.

**27.** *Ibid.* See also Sayre, *op.cit.*, at 982.

**28.** Pollock and Maitland, *op.cit.*, at 476. And see Levitt, *The Origin of the Doctrine of Mens Rea*, 17 Ill.L.Rev. 117 (1922).

**29.** Moreland, *op.cit.*, at 6; Sayre, *op.cit.*, at 986; 2 Holdsworth, *History of English Law* (3d Ed. 1923), at 358-359.

**30.** See note 21 *supra.*

and (4) all other homicides, each of which was a felony and a capital offense." [31]

For both of the culpable categories where the royal pardon was not available as a matter of course (3 and 4 above), benefit of clergy came to apply as a device which was in effect a commutation of capital punishment for all who could claim to read and write. Because of the feeling, however, that the law had become too soft on major offenders, a series of statutes at the end of the 15th and the beginning of the 16th centuries [32] removed the benefit of clergy from murder with "malice prepensed." [33] The term "murder" thenceforth was limited to this more blameworthy form of homicide with malice aforethought, for which benefit of clergy was no longer available and which was thereby capital. The lesser felonious homicide without malice aforethought, for which benefit of clergy was still available,[34] later came to be called manslaughter.[35]

Thus, between 1496 and 1547 "malice aforethought" came to be the criterion by which three distinct discriminations were made. With little significant change in function, these are the three aspects of blameworthiness which the word "malice" still connotes today. In the first place, the presence of malice aforethought separated non-clergyable and thereby capital murder from justifiable homicide (homicide which is either authorized or commanded by law), which entitled the accused to a complete acquittal. In the second place, the presence of malice aforethought separated non-clergyable and thereby capital murder from excusable homicide, which entitled one to a royal pardon as a matter of course (although not an acquittal). In the third place, the presence of malice aforethought separated non-clergyable and thereby capital murder from the less blameworthy and

---

31. Moreland, *op.cit.*, at 9. And see Sayre, *op.cit.*, at 995.
32. See note 21 *supra*.
33. "Malice prepensed" was simply Law-French for "malice before thought" or, more stylistically, "malice aforethought."
34. Entailing simply a year's imprisonment and a branding of the thumb. Sayre, *op.cit.*, at 996-997.
35. Moreland, *op.cit.*, at 9-10.

clergyable felonious homicide, which gradually evolved into the felony of manslaughter.

These are essentially still the three aspects of "malice" and the three functions performed by those aspects. "Malice" today requires:

1) that the act which produces the homicide be intentional (thereby excluding a purely accidental, to wit excusable, homicide per misadventure);

2) that the act be without justification or excuse (thereby excluding justifiable and other excusable homicides, both of which today would entitle the accused to an acquittal); and

3) that the act be unmitigated (thereby excluding the mitigated or extenuated, albeit still felonious, homicide which is punished simply as manslaughter).

b. *Non-Malicious "Malice" and Non-Premeditated "Afore-thought"*

Over the centuries since 1547, malice aforethought has lost a great deal of its original meaning but has also taken on a great deal of new meaning. We will look first to the semantic erosion and then to the semantic growth.

It is a source of inevitable jury confusion that "malice aforethought" today is neither "malicious" nor "thought of beforehand." It has, of course, become a commonplace to lawyers that "malice" connotes nothing which would strike a layman as "malicious." It has come to mean simply an intention to commit a criminal act with no hatred or ill-will required. As Holmes noted in his *Common Law* (1881), at 53:

"It is just as much murder to shoot a sentry for the purpose of releasing a friend, as to shoot him because you hate him. Malice, in the definition of murder, has not the same meaning as in common speech, and, in view of the considerations just men-

tioned, it has been thought to mean criminal intention.

. . .

. . . [A] newly born child is laid naked out of doors, where it must perish as a matter of course. This is none the less murder, that the guilty party would have been very glad to have a stranger find the child and save it."

Equally to the point is Perkins, *Criminal Law* (2d Ed. 1969), at 35:

"In ordinary conversation the word 'malice' conveys some notion of hatred, grudge, ill-will, or spite, but no such idea is incorporated in the legal concept of 'malice aforethought.' . . . this crime may be perpetrated without the slightest trace of personal ill-will. Illustrations include the case of a mother who kills her illegitimate offspring to hide her own disgrace, feeling at the time no hatred toward it or any other person and even having the yearnings of a mother's love toward the innocent victim — 'loving its life just less than her own reputation.' There may be added the case of the husband who killed his wife at her request, because his love was too great to permit the continuance of her suffering from a hopeless disease. Even such extreme cases as these have been held to fill every requirement of malice aforethought. . . ."

A similar erosion took place with respect to the word "aforethought." In its pristine state, it connoted that the intention to kill had existed some appreciable time before the actual execution of the deed. It connoted the same thing by way of preplanning that premeditation connoted early in the 19th century (when it entered the law as an attempt to rejuvenate the earlier meaning of "aforethought") and significantly more by way of preplanning than premeditation connotes today (premeditation having in the meantime suffered a semantic erosion of its own). The word

"aforethought" today is devoid not simply of an ordinary, layman's meaning but of any meaning at all, even as a term of art. As is pointed out by Perkins, *Criminal Law* (2d Ed. 1969), at 34-35:

"Undoubtedly the word 'aforethought' was added to 'malice' in the ancient cases to indicate a design thought out well in advance of the fatal act. But as case after case came before the courts for determination, involving killings under a great variety of circumstances, there came to be less and less emphasis upon the notion of a well-laid plan. And at the present day the only requirement in this regard is that it must not be an *after*thought. 'Killing with malice' is sufficient of itself to negative any possible notion of an afterthought, and apart from the historical background the word 'aforethought' would not be needed."

To the same effect is Purver, *The Language of Murder*, 14 U.C.L.A.L.Rev. 1306, 1309 (1967):

"Just as the word 'malice' confuses and misleads, the word 'aforethought' likewise muddles thinking:

'The fact that malice aforethought means merely that malice must exist at the same time as the act, in effect makes 'aforethought' meaningless surplusage, since the requirement is satisfied by the presence of malice or 'concurrent' malice rather than an antecedent malice. The unimportant character of the adjective 'aforethought' is seen in the fact that in many opinions 'malice' and 'malice aforethought' are used interchangeably and that in many, 'aforethought' is itself omitted.' [Quoting from 1 Wharton, *Criminal Law and Procedure* § 243, at 527 (Anderson Ed. 1957)]

Since today 'aforethought' may be 'as instantaneous as successive thoughts of the mind' or 'on the spur of the moment,' the word no longer

serves its original function of drawing attention to the duration of the deliberation to kill as the criterion for distinguishing murder from other homicides."

The use of the now anachronistic language still haunts us, however. As Purver further points out, at 1306:

"Precision in the use of legal language is essential, particularly in the law of homicide. In a murder trial the use of a word or turn of a phrase may mark the difference between whether the accused leaves the courtroom free — or sentenced to death.

Yet the phrase 'malice aforethought,' used in defining murder, peers at us like a demon through the dust of more than four hundred years of history, lying in wait to clutter statutes and confuse juries. In examining the historical background of the phrase, one probes the roots of a term which, though withering on the vine, lives on to strangle the penal codes of the several states."

And, at 1309:

"Since 'malice' does not mean 'ill-will' and 'aforethought' does not mean 'beforehand,' jury instructions, though necessary, sound ridiculous."

The word "aforethought" is today an absolutely useless appendage on our law. It has over the centuries been utterly drained of any meaning whatsoever. As a word of no utility but with an ever-present potential for confusion (some may innocently think that "aforethought" means aforethought), it should be struck from the lexicon of our homicide law.

c. *The Growth of Implied Malice*

Throughout the 17th century, the meaning of "malice" grew even as the meaning of "aforethought" shrank. With the use by the year 1547 of "malice aforethought" as the criterion to separate serious and non-clergyable murder from less serious felonious homicide, English society and a

responsive judiciary began to feel the need to expand the more serious or "malicious" category. "An advancing civilization was reaching the point where it demanded punishment for certain additional homicides." Moreland, *op.cit.*, at 11. This growth of the category "murder" was accomplished in three ways. As was discussed in the preceding section, the meaning of "aforethought" (as a limitation upon malice) shrank to the point of nothingness, so that many sudden and unexplained killings could be punished as murder. This period also saw the birth and early growth of the doctrine of transferred intent (discussed in section II E 2 above). Most significantly, this period marked the birth and full maturing of "implied malice."

Originally, the intent required for murder was the "intent to kill" — the state of mind which we today call "express malice." The 17th century (and very late 16th century) recognized the need to punish as murder homicides resulting from other life-endangering intents, even though such intents did not involve literally the intent to kill. These additional mental states were added to the *mens rea* of murder during this period and they are what we today call:

1) intent-to-do-serious-bodily-injury murder;

2) felony-murder; and

3) depraved-heart murder.[36] (Perkins gives this mental state the less emotionally charged and probably better label of "Wanton and Wilful Disregard of Unreasonable Human Risk".)

It is beyond the scope of this review to analyze substantively these additional mental states that today represent various forms of the *mens rea* of murder. They are

---

36. LaFave and Scott, *Criminal Law* (1972), at 528-530; Clark and Marshall, *Law of Crimes* (6th Ed. Wingersky Revision 1958), at 572-587; Perkins, *Criminal Law* (2d Ed. 1969), at 35-46. It is arguable that there is yet a fourth category of "implied malice" involving intent-to-resist-lawful-arrest murder, but the modern authorities are skeptical of this addition to the category, thinking that any truly murderous situations are well handled by one or another of the other members of the category. In any event, the addition or deletion of one member of the "implied malice" family is unnecessary for purposes of this survey of the homicide field in terms of due process.

well recognized in Maryland law. As Chief Judge Orth noted for this Court in *Lindsay v. State*, 8 Md. App. 100, 104-105, 258 A. 2d 760:

> "Malice is divided into express and implied malice. Express malice exists whenever an accountable person kills another intentionally unless the killing is justifiable or excusable or unless there is a mitigating circumstance. . . . But a specific intent to kill is not a requisite of murder. One may commit murder without an actual intent to kill, for the law will imply malice in some unintentional killings and this is called 'implied malice' or 'constructive malice' or 'malice in law.' Two of such classes of unintentional killing, committed without justification or excuse or a mitigating circumstance, in which malice is implied, are where (1) there was an intent to inflict great bodily harm; and (2) conceding that there was no actual intent to injure, an act was done or duty omitted wilfully, the natural tendency of which was to cause death or great bodily harm." [And, by way of n. 6, adding, *inter alia*, the typical felony-murder situation "when death was caused during the commission of, or attempt to commit, some other felony."]

The important thing to be noted for present purposes, as we survey the homicide field under the microscope of *Mullaney v. Wilbur*, is that the mental states here involved are today definitely a part of our substantive law. Four separate intents are each sufficient to constitute the *mens rea* of murder whenever an unlawful and unmitigated homicide results from the intended act. The first of these — the intent to kill — we happen to call "express malice," because it was the original intent recognized by our law of murder. The other three of these — the intent to do grievous bodily harm, the intent to do a wanton and depraved life-endangering act and the intent to do a dangerous felony — we sometimes group under the umbrella label of "implied malice," because of the mechanism by which they came to be added to the law.

During the 17th century, the common law judges went through the fiction of "inferring," "implying," or "presuming" an intent to kill from these other intents. Whatever the roundabout historic mechanism of getting these intents into the law, we now flatly recognize that they are independent and self-sufficient mental states to constitute murder and are not mere avenues to the finding of "intent to kill." Perkins, *Criminal Law* (2d Ed. 1969), summarized the historic process, at 35-36:

> "The more difficult aspect of the problem is that there may be malice aforethought without an actual intent to kill. The older authorities assumed the necessity of an intent to kill and then resorted to an 'implied intent' of this nature when none in fact existed. But now the courts speak more factually and say frankly that murder may be committed under some circumstances without an intent to kill. . . ."

In dealing with one variety of "implied malice" that may or may not now be a part of our substantive law — the intent to resist lawful arrest — Moreland, *op.cit.*, at 13, describes eloquently the process by which additional mental states were gradually incorporated into our expanding notion of "malice":

> "In the beginning, this extension in the law was rationalized as an intentional killing. By strained reasoning, it was inferred that the killer had thought the matter over in advance and determined to kill rather than to be taken into custody. This seems fictitious rather than a reasonable inference of fact and was apparently occasioned by the fact that malice aforethought at the time was considered in its popular sense of a deliberate intent to kill formed prior to the fatal act, so some such reasoning was necessary to satisfy this requirement.
>
> However, as malice aforethought began to lose its natural meaning and to become a phrase of art with

a number of meanings, the requirement of actual intent to kill formed prior to the homicide was dispensed with and the resistance to lawful authority was substituted for, or more accurately speaking became a type of, malice aforethought."

Perkins, *A Re-examination of Malice Aforethought*, 43 Yale L.J. 537 (1934), describes the same process by which the intent to commit a felony was incorporated or absorbed into the expanding notion of "malice," at 547:

"The notion that one who killed a man whom he had intended only to rob, was guilty of murder had made its appearance in the days of Lambard, and was explained by him on the ground that the law 'implyeth a former malicious disposition in him rather to kill the man, than not to have his money from him.' This does not carry conviction as an inference of fact. It falls distinctly into the field of fiction, by which there is imputed to a man a state of mind which was not actually present. On this cornerstone is laid the foundation for quite a different meaning for the words 'express' and 'implied,' as qualifying the phrase 'malice aforethought,' and there begins to appear, thinly camouflaged by fiction for a time, the recognition of an actual difference in the states of mind represented by these two terms."

Perkins, *op.cit.*, further points out, at 547-548, the fact that we have outgrown the fiction and recognize the growth of substantive law for what it truly is:

"For a time the fictitious formula prevailed. An intent to kill or injure was required for malice aforethought; but in certain cases, such as the robber who killed his victim by accident during the attempt to rob him, the slayer was conclusively presumed to have had such an intent. This could not conceal the fact that the malice 'implied' in such a case had reference to a different psychical

element than the actual intent to cause death or bodily harm, and in the course of generations judges tended more and more to override the fiction and to recognize frankly that there may be malice aforethought without any design to kill or injure."

Despite the continued use of the treacherous and illusive participle "implied," [37] the separate mental states that we group under the category "implied malice" do not today *imply* anything. They are not presumptions which may be rebutted. They are not inferences which may be declined. A jury may not be told that if it finds an intent to rape, rob, burglarize, etc., it *may, but need not,* find a resulting homicide to have been with malice. It is not the case that these mental states *imply* malice; it is rather the case that they *are* malice by definition.

Since these mental states are today unequivocally a part of our substantive law on the *mens rea* of murder, they are unaffected by anything in *Mullaney v. Wilbur.*

d. *A Linguistic Sandtrap: "Implied Malice" is Not Necessarily Inferred*

The thing to be proved — the probandum — does not

---

**37.** The word is from the language of procedure and not from the language of definition. It suggests that what the facts imply, the fact finders may infer. One can only rue the needless confusion wrought by an anachronistic vocabulary and long for the clarifying wisdom of Professor Perkins at *Criminal Law* (2d Ed. 1969) 46:

"Since murder cannot be adequately defined in terms of an intent to kill, without resort to the ancient fiction whereby such an intent was 'implied' in certain cases in which it did not exist in fact, some other phrase must be used. And since malice aforethought is neither a self-explanatory phrase, as used in the law, nor one which designates any single and invariable frame of mind, it is probably wise to employ a phrase to which a meaning may be assigned quite arbitrarily. The phrase 'man-endangering-state-of-mind' is suggested for this purpose with the assumption that it be arbitrarily understood to include every attitude of mind which includes (1) an intent to kill, or (2) an intent to inflict great bodily injury, or (3) an intent to do an act in wanton and wilful disregard of an unreasonable human risk (i.e. the wilful doing of a wanton act under such circumstances that there is obviously a plain and strong likelihood that death or great bodily injury may result), or (4) an intent to perpetrate a dangerous felony."

control the method of proving it. The four alternative mental states that will establish the *mens rea* of murder — 1) an intent to kill, 2) an intent to do grievous bodily harm, 3) an intent to do a wantonly life-endangering act with a high risk of causing death, and 4) an intent to commit a dangerous felony — are the alternative things to be proved, the probandi. Each is an alternative substantive element of the crime of murder. These elements, just as any element of any crime, may be proved by any available and acceptable method of proof.

Because of the associative power of words, however, a "knee-jerk" reaction is frequently triggered — and it is wrong. Because the label "express" has been put upon the first of these substantive mental elements, we erroneously assume that the method of proving it must be direct rather than inferential or circumstantial. Such is, of course, not the case. By the same token, because the label "implied" (largely by historic accident) has been put upon the latter three of these substantive mental elements, we erroneously assume that the method of proving them must be inferential rather than direct. Again, such is not the case.

The purely coincidental and unfortunate use of the words "express" and "implied" to describe substantive elements suggests nothing whatsoever about the method of proving those elements. Each of the alternative mental elements — whatever its label — may be proved either directly or indirectly as the facts of each case dictate.

An intent to kill — "express malice" — may, of course, be proved directly. (Witness: "I heard the defendant say, 'I am hereby killing you because I hate you.'") It may also be, and frequently is, proved inferentially. As will be discussed in the next section, the use of a deadly weapon directed at a vital part of the human anatomy gives rise to an inference of an intent to kill. (We therefore infer "express malice.")

Similarly, the intents to do 1) grievous bodily harm, 2) a depravedly reckless life-endangering act or 3) an underlying felony—the three forms of "implied malice" — may all be proved directly. (Witness 1: "I heard the defendant say, 'I am now going to horsewhip that scoundrel within an inch of his

life to teach him a lesson'"; Witness 2: "I heard the defendant say, 'I am hereby throwing this heavy desk from the roof of the Empire State Building during lunch hour for the sheer thrill of it. I hope no one will be hurt, but that's not my problem'"; Witness 3: "I heard the assailant say, 'Hands up! Give me the money in the cash drawer.'") Implied malice — by definition, any of the above intents — is thus proved directly and not inferentially. It may also be proved inferentially, of course, just as anything may be proved inferentially. The intent to do grievous bodily harm may be inferred from the use of a deadly weapon; the intent to do a depravedly reckless act may be inferred from the doing of the act; the intent to perpetrate an underlying rape may be inferred from knocking a woman to the ground, ripping off her clothing and inserting the penis into her body.

The words "express" and "implied" — describing substantive elements — cannot carelessly be taken in a procedural sense as suggesting modes of proof. There is absolutely no correlation between the words "express" and "implied," on the one hand, and evidentiary modes, on the other. Notwithstanding this lack of correlation, the number of Maryland opinions which have linguistically "gone into the rough" on this hazard is embarrassingly legion.

### F. *Head Three of the Hydra: A Permitted Inference of Fact*

Some mislabeled "presumptions" have turned out, upon careful examination, to be nothing more than permitted inferences of fact. Some apologists generously have explained that the earlier use of the word "presumption" was merely intended to connote a "presumption of fact" (to wit, an inference), which was always to be distinguished from a true "presumption of law." When the due explanations have been made and the "inference" drops down from the burden-shifting world of legally significant "presumptions" to the more ordinary world of the inductive, reasoning process, what is the creature "inference" that we are looking at?

In a real sense, the whole decision-making process is the process of drawing inferences. From fact A, we infer fact B.

From a confession, we infer guilt. From the pulling of a trigger, we infer an intent to harm. From the possession of recently stolen goods, we infer the theft. From the motive, we infer the criminal agency. From the presence of the sperm, we infer the penetration. From the muddy footprints on the living room rug, we infer the unlawful entry. The whole phenomenon of circumstantial evidence is the phenomenon of inferring facts in issue from facts established. The study of the process of drawing inferences is as much the field of the psychologist and the logician as it is the field of the reviewing judge. Yet certain inferences, out of the infinite swarm of their fellows, have been singled out for legal analysis. Why?

It is difficult to say why certain of this infinite company of factual inductions have been marked for special scrutiny. It was most likely the accident of fortune that caused some of the stronger and more frequently employed inferences to be elevated to the level of "presumptions" in the first place and then, because some of that number were not sufficiently compelling to remain as true "presumptions," to drop back again to the world of ordinary inferences. It was probably this rise to and fall from prominence that marked them for special treatment by the courts.

In any event, an inference comes to our attention in only two situations. When we are called upon to measure the legal sufficiency of evidence, we have to determine whether established facts A and B are legally sufficient to give rise to a fair inference of fact C, the ultimate fact in issue. We are similarly called upon to measure the efficacy of certain inferences when we are asked to instruct a jury that it may (although it need not) infer fact C from established facts A and B.

Since an inference does not shift a burden either of persuasion or of going forward with evidence to a defendant, it does not come under the scrutiny of *Mullaney v. Wilbur* in that regard. Since an illogical or improbable "inference" would, however, unfairly relieve the State of part of its burden of proving every element of a case beyond a reasonable doubt, the inference, even as a mere inference,

must pass constitutional muster under *United States v. Gainey*, 380 U. S. 63, 85 S. Ct. 754, 13 L.Ed.2d 658 (1965); *United States v. Romano*, 382 U. S. 136, 86 S. Ct. 279, 15 L.Ed.2d 210 (1965), and *Leary v. United States*, 395 U. S. 6, 89 S. Ct. 1532, 23 L.Ed.2d 57 (1969). It must, therefore, be based upon a rational connection between the facts established and the fact to be inferred. Conversely, it "must be regarded as 'irrational' or 'arbitrary,' and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact [the inferred fact] is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States, supra,* at 89 S. Ct. 1548, cited in *Lindsay v. State, supra,* at 8 Md. App. 109.

The only inference of any significance in our homicide law is the permitted inference of an intent to kill or of an intent to do grievous bodily harm from the directing of a deadly weapon at a vital part of the human anatomy or from some similar use of deadly force. The earlier case law sometimes spoke of the use of a deadly weapon as giving rise to a "presumption of malice." In *Lindsay v. State, supra,* however, Chief Judge Orth stole a march on *Mullaney v. Wilbur* and strove mightily to refine the appellate vocabulary of Maryland and to bring it into the 20th century. He meticulously explained that we do not "presume" anything from the use of deadly force; we are only permitted (but not required) to draw inferences from such use of deadly force. He further pointed out that this permitted inference of fact passes full constitutional muster under *Leary v. United States, supra.* We reaffirm and add that it thereby also passes constitutional muster according to *Mullaney v. Wilbur* and *Winship.*

One strong caveat in this regard is of overriding importance. Even when we are careful simply to permit an inference from the use of deadly force and not to presume anything therefrom, we must meticulously limit the predicate which may be inferred. Much of our case law speaks carelessly of inferring (or presuming) *malice* from the use of deadly force. This is an overly broad employment of the inference which is unconstitutional.

The danger lurks in the fact that "malice" means all of three different things:

1) the intention of doing a particular act;
2) the absence of justification or excuse; and
3) the absence of mitigating circumstances.

The use of deadly force properly gives rise to a permitted inference only of the first aspect of malice, that is, the intent to kill (or, alternatively, the intent to do grievous bodily harm).[38] It does not, with any degree of probity or probability, give rise to a permitted inference that the killing was without justification or excuse. The lawful executioner, the soldier in combat, the policeman chasing the dangerous and fleeing felon, the homeowner rightfully defending himself — all may direct deadly force. It is a fair inference that they all intended to kill, but it is not a fair inference that they did so without justification or excuse. By the same token, the outraged and cuckolded husband, who is still in hot blood upon discovering his wife in an act of adultery, may also direct deadly force at his victim. It is a fair inference that he intended to kill but not a fair inference that he did so without the mitigating circumstance of hot blood upon legally adequate provocation.

The Maryland case law is replete with the overly broad statements that "malice" may be inferred from the use of a deadly weapon directed at a vital part of the human body. The qualification is not made that only one aspect of malice may be inferred and that two other aspects may not be so inferred. *Tate v. State,* 236 Md. 312, 317, 203 A. 2d 882; *Houston v. State,* 225 Md. 403, 404, 171 A. 2d 233; *Chase v. Jenifer,* 219 Md. 564, 569, 150 A. 2d 251; *Chisley v. State,* 202 Md. 87, 105, 95 A. 2d 577; *Woodard v. State,* 13 Md. App. 114, 123, 282 A. 2d 9. If the word malice must be used at all, any statement as to it should be carefully qualified, as was done in *Cook v. State,* 9 Md. App. 214, 218, 263 A. 2d 33, "It has

---

**38.** The second intent is not totally redundant to the first. Even from the use of a deadly weapon, the jury might decline to infer the intent to kill but nonetheless choose to infer the intent to do grievous bodily harm. The *mens rea* of murder would, thus, still be proved.

been consistently held, that *in the absence of excuse, justification or a mitigating circumstance,* malice is inferred from the use of a deadly weapon directed at a vital part of the body." (Emphasis supplied) It would, of course, be preferable to speak simply of the intent to kill or the intent to do grievous bodily harm as being inferable and not to speak of malice at all.

When we speak of the inference, therefore, we must scrupulously restrict its operation to that limited aspect of malice involving the intent to kill or the intent to do grievous bodily harm. We must never speak of inferring malice generally. This universal statement may all too easily be taken as permitting the inference of those other aspects of malice which are 1) the absence of justification or excuse and 2) the absence of mitigation. Such an inference would, of course, be clearly unconstitutional under *Mullaney v. Wilbur* and *Winship.* It would relieve the State unfairly of proving both the absence of justification or excuse and the absence of mitigation. It would thereby put upon the defendant the unconstitutional burden of exculpating himself generally or of lowering his guilt to manslaughter. Again, the transparently simple solution is to refer directly to the intent element as the subject of the inference and to eliminate altogether the circuitous and unnecessary middle term "malice."

G. *Head Four of the Hydra: A True Presumption (In the Morgan Tradition)*

Whereas an inference may be drawn by a fact finder but may be just as readily rejected, a presumption, if unrebutted, is mandatory in effect. It has immediate legal consequences and controls the procedural course of the trial. It operates not so much upon the decision-making function of the fact finder as upon the ruling-making function of the judge.

The most immediate and direct impact of *Mullaney v. Wilbur* is to outlaw in a criminal trial any presumption in the Morgan tradition that operates against a defendant.[39] In

___

39. A presumption in this tradition could not operate against the State in

that Morgan tradition, a presumption cast upon the party against whom the presumption operated the burden of ultimate persuasion when it came to contradicting the presumed fact. That burden generally had to be sustained by a preponderance of the evidence. The jury received instructions on 1) the existence of the presumption (it had evidentiary weight for the jury) and also 2) the burden to be borne by the defendant if he would overcome the presumption. ("If you do not find that the defendant has persuaded you to the contrary by a preponderance of the evidence, you *will* find the presumed fact.") This was the rule throughout much of the common law world with respect to the so-called "affirmative defenses." The defendant bore the ultimate risk of non-persuasion. If the minds of the jurors were in a state of equipoise on the existence or non-existence of self-defense, hot-blood, entrapment, etc., the defendant lost because he had not carried his burden of preponderating persuasion. Casting upon a defendant that sort of burden of ultimately persuading the jury of his innocence (by negating in one fashion or another the necessary criminal element of a guilty mind) was the thing condemned in *Mullaney v. Wilbur* and *Winship*. A presumption as conceived of by Morgan may still have some utility for civil trials,[40] but in a criminal trial it cuts

a criminal trial, since the State may not have *shifted* to it the thing which it already has, to wit, the burden of persuasion. The effect of a presumption, in either tradition, is always to shift a burden (of some sort) to the opposing party.

40. *Mullaney v. Wilbur*'s reliance upon and indebtedness to the profound analysis of Fletcher, *Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases.*" 77 Yale L.J. 880 (1968), is apparent when the Supreme Court opinion and the law review article are read side by side. Professor Fletcher demonstrates convincingly that there are two distinct sets of rules and procedures at work in our law — "the model set by private litigation" and "the model focusing on the justification for invoking criminal sanctions" — and that much of our present-day confusion resulted from the tendency of 19th century jurists falsely to analogize the latter to the former. He discusses the pattern dominant in the 19th century of "assimilating burden-of-proof disputes in criminal cases to the model set by private litigation":

"In the course of a century, the orientation of the criminal process has shifted from the model set by private litigation to a model focusing on the justification for invoking criminal sanctions. . . . Since that time [the mid-19th century] the courts of the Western world have come to appreciate the uniqueness of the fact-finding

squarely athwart the due process requirement that the State prove every element of a crime (including *mens rea*) beyond a reasonable doubt.

*Mullaney v. Wilbur* set out the earlier tradition, of which the Maine manslaughter law was an example, at 44 L.Ed.2d 516:

> "Absent proof that an unlawful homicide resulted from 'sudden and sufficiently violent provocation,'

process in criminal cases. The problem in criminal trials is not one of efficiently arriving at a fair settlement of a dispute, but of determining whether the state may justly condemn a man and deprive him of his liberty. The problem, in short, is to justify the use of the state's coercive powers. Concern for justifying the use of criminal sanctions is increasing; and that increasing concern explains the progressively more favorable position of defendants on the risk of residual doubt at trial.

A specific theory of justification has emerged from the burden-of-persuasion decisions of the last 100 years. That theory is that the state may justly punish only those individuals whose violation of the law is morally blameworthy." Fletcher, *op.cit.*, at 888.

What emerges is that the use of a presumption in the Morgan tradition may remain perfectly appropriate for civil litigation, where burdens even of ultimate persuasion may shift back and forth throughout the course of a trial. It is not inappropriate in such civil litigation to require a person asserting a position to bear the burden of proving that position. "The proponent of an issue bears the burden of that issue." Nor is it inappropriate to adjust the burden of persuasion where facts are "peculiarly within the knowledge" of one of the parties. McCormick, *Evidence* (1954), at 675. Such a tradition, however, is not appropriate as a model for the criminal law:

> "Oriented as they were toward private litigation, courts in the 19th century regarded rules of criminal liability as functional analogues to rules for settling private disputes....
>
> In contrast, the emergent rules of criminal liability are rules that do not admit of exceptions. Unlike rules of private law, they encompass all relevant substantive issues; their function is to enumerate the necessary and sufficient substantive conditions for the justified use of criminal sanctions. When applied at trial, they generate only one question: are the conditions of criminal guilt satisfied? Defensive issues, like self-defense and insanity, are raised not as exceptions, but as denials of liability under the rule.
> . . .
> ... The virtue of this unified structure is that all substantive issues thus encompassed, be they affirmative or negative in form, be they inculpatory or exculpatory in effect, play the same functional role in determining the defendant's liability for crime. This functional parity derives from the one factor unifying the issues so structured: they all relate to the defendant's moral guilt in acting contrary to law." Fletcher, *op.cit.*, at 892-893.

the homicide was 'presumed to be malicious.' *Id.*, at 201. In view of this presumption, the early English authorities, relying on the case of *The King v. Oneby*, 92 Eng.Rep. 465 (KB 1727), held that once the prosecution proved that the accused had committed the homicide, it was 'incumbent on the prisoner to make out . . . all . . . circumstances of justification, excuse or alleviation . . . to the satisfaction of the court and jury.' 4 Blackstone's *Commentaries* 201. See Foster, *Crown Law* 255 (1762). Thus, at common law the burden of proving heat of passion on sudden provocation appears to have rested on the defendant."

The Supreme Court then set out to trace how the notion that a defendant would have to negate malice by a preponderance of the evidence had ever been injected into the law in the first place. The source of the idea, from which it spread rapidly to other American jurisdictions, was Chief Justice Lemuel Shaw for the Supreme Judicial Court of Massachusetts in *Commonwealth v. York*, 9 Met. (50 Mass.) 93 (1845). *Commonwealth v. York* required a defendant to negate malice aforethought by proving by a preponderance of the evidence that he acted in the heat of passion.[41] In

---

41. Professor Fletcher, *op. cit.*, diagnosed clearly where Chief Justice Shaw had gone wrong in 1845. Sir Michael Foster in his *Crown Law* (1762) 255, asserted that the prisoner had "satisfactorily" to prove circumstances of "accident, necessity and infirmity." Sir William Blackstone, at 4 *Commentaries* 201 (1776), simply took the statement from Foster and reformulated it to the effect that the defense had the burden of showing "circumstances of justification, assurance and alleviation." Professor Fletcher points out how both Foster and Blackstone relied upon a single case, *Rex v. Oneby*, 92 Eng. Rep. 465 (1727). In looking to the source case, Professor Fletcher explained that Oneby's case came before the judges of the King's Bench on a special verdict stipulating that the defendant had killed a man in a fight over a game of cards. The facts stipulated in the verdict did not admit the construction that Oneby killed under provocation. As Professor Fletcher points out, the rule of that case to the effect that the burden was upon the defendant to show mitigation in all probability meant that the burden was upon him of producing evidence in order to generate a jury issue. Professor Fletcher makes clear, at 904-906:

"For all of its influence, the Blackstonian rule on the burden of persuasion contains serious flaws. It was born of a particular method of trial — the special verdict; but it came to be applied as a rule on the instructions to be given to juries with the responsibility for making ultimate determinations of guilt. As one passes from

*Davis v. United States,* 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1895), the Supreme Court rejected the *Commonwealth v. York* approach for the federal courts. *Mullaney v. Wilbur* went on to point out how England itself had rejected such an approach in 1935 in *Woolmington v. Director of Public Prosecutions,* 1935 A. C. 462, and now requires "the prosecution to negate heat of passion on sudden provocation

> one system of trial to the other, one encounters a critical ambiguity in the phrase 'burden of proof' — an ambiguity that remains in the background of cases like *Oneby,* where the court's task is merely to construe gaps in the jury's specification of the facts. . . .
>
> So far as the rationale of *Oneby's Case* is applicable in instances of general verdicts, the language of the opinion ('It lies on the party indicted to prove the sudden quarrel') may refer either to the burden of persuasion or to the burden of going forward. The problem, of course, is deciding to which of these burdens the language of the case should be deemed to refer. . . . [T]he principle of *Oneby* is clear: it is up to the defendant, not the prosecution, to raise a triable issue of malice. This the defendant may do by going forward with 'some evidence' on the issue of provocation by a sudden quarrel; therefore, in the context of a trial leading to a general verdict, the *Oneby* demand that the defendant 'prove' the issue should mean no more than the defendant must go forward with evidence on that issue.
>
> For several reasons, Chief Justice Shaw failed to confront the ambiguity of the 'burden of proof' in his *York* opinion. First, in the mid-19th century there was little, if any, sensitivity to the ambiguity . . ."

Indeed, the Supreme Court in *Mullaney v. Wilbur* pointed out that the blurring of the distinction between a burden of persuasion and a burden of producing evidence was almost inevitable at the time of Chief Justice Shaw because his times were not sensitive to that subtle distinction, saying, at 44 L.Ed.2d 517, n. 20:

> "Some confusion developed, however, as to precisely what *York* required. Contemporary writers divide the general notion of 'burden of proof' into a burden of *producing* some probative evidence on a particular issue and a burden of *persuading* the fact finder with respect to that issue by a standard such as proof beyond a reasonable doubt or by a fair preponderance of the evidence. See, *e.g.,* McCormick, *Evidence* § 336 (2d ed. 1972). This distinction apparently was not well recognized at the time *York* was decided, and thus in some jurisdictions it was unclear whether the defendant was required to bear the production burden or the persuasion burden on the issue of heat of passion."

Thus, the principle of a single English decision, in the limited context of what legal significance to attach to a special jury verdict, in 1727 was set out without necessary qualification by a text writer (Foster) in 1762, picked up from that source by a second text writer (Blackstone) in 1776, applied uncritically by a Massachusetts chief justice in 1845, and haunts the common law of Maryland (and many other jurisdictions) in 1975, some 248 years later.

by proof beyond a reasonable doubt," at 44 L.Ed.2d 518, n. 22. It pointed out that "the large majority of States have abandoned *York* and now require the prosecution to prove the absence of the heat of passion on sudden provocation beyond a reasonable doubt." *Ibid.* Indeed, the Supreme Court noted that Chief Justice Shaw himself appeared to waver in *Commonwealth v. Hawkins,* 3 Gray (69 Mass.) 463, 465 (1855), ten years after his decision in *York,* and restricted the doctrine of *York* to the situation "where the killing is proved to have been committed by the defendant, and *nothing further is shown* . . ." (Emphasis supplied by Supreme Court) 44 L.Ed.2d 517, n. 20. The Supreme Court went on to describe the amended position of Chief Justice Shaw, pointing out, at 44 L.Ed.2d 517, n. 20:

"He further noted that this presumption did not govern when there was evidence indicating that the defendant might have acted in the heat of passion. In that situation, 'if the jury, upon all the circumstances, are satisfied, beyond a reasonable doubt, that [the homicide] was done with malice, they will return a verdict of murder; otherwise they will find the defendant guilty of manslaughter.' *Id.,* at 466. Thus, even the author of *York* quickly limited its scope to require only that the accused produce some evidence on the issue of passion; that is, that he satisfy the production but not the persuasion burden. Other jurisdictions blurred the distinction between these two burdens by requiring the defendant to prove 'to the satisfaction of the jury' that he acted in the heat of passion."

In stating clearly that once the issue of manslaughter was fairly in the case the State had the burden of proving non-mitigation beyond a reasonable doubt, the Supreme Court disposed of the argument that the prosecution ought not be required to negate a mental state known best to the defendant himself, reasoning, at 44 L.Ed.2d 521:

"It has been suggested . . . that because of the difficulties in negating an argument that the

homicide was committed in the heat of passion the burden of proving this fact should rest on the defendant. No doubt this is often a heavy burden for the prosecution to satisfy. The same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial. But this is the traditional burden which our system of criminal justice deems essential.

Indeed, the Maine Supreme Judicial Court itself acknowledged that most States require the prosecution to prove the absence of passion beyond a reasonable doubt . . . In this respect, proving that the defendant did not act in the heat of passion on sudden provocation is similar to proving any other element of intent; it may be established by adducing evidence of the factual circumstances surrounding the commission of the homicide. And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not, as the Court has long recognized, justify shifting the burden to him . . ."

The holding was then clear, at 522:

"Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can be given a life sentence when the evidence indicates that it is *as likely as not* that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S., at 372, 25 L.Ed.2d 368, 90 S.Ct. 1068 (concurring opinion). We therefore hold that the Due Process Clause requires the prosecution to

prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."

### 1. *The Applicability to Affirmative Defenses Generally*

There can be do doubt as to the applicability of the *Mullaney v. Wilbur* principle to the so-called "affirmative defenses" generally. The *Mullaney v. Wilbur* opinion itself, in pointing out that even Maine law required the State to carry the full burden on the issue of negating self-defense, essentially equated the situations involving mitigation and self-defense, saying, at 44 L.Ed.2d 521-522:

"Nor is the requirement of proving a negative unique in our system of criminal jurisprudence. Maine itself requires the prosecution to prove the absence of self-defense beyond a reasonable doubt. See *State v. Millett*, 273 A.2d 504 (1971). *Satisfying this burden imposes an obligation that, in all practical effect, is identical to the burden involved in negating the heat of passion on sudden provocation.* Thus, we discern no unique hardship on the prosecution that would justify requiring the defendant to carry the burden of proving a fact so critical to criminal culpability." (Emphasis supplied)

That Maryland clearly cast upon a defendant the burden of persuasion by a preponderance of the evidence on the issue of self-defense cannot be doubted. *Gunther v. State,* 228 Md. 404, 410-411, 179 A. 2d 880; *DeVaughn v. State,* 232 Md. 447, 457, 194 A. 2d 109; *Perry v. State,* 234 Md. 48, 52-53, 197 A. 2d 833; *Davis v. State,* 237 Md. 97, 103, 205 A. 2d 254; *Wilson v. State,* 261 Md. 551, 559, 276 A. 2d 214; *Bradford v. State,* 234 Md. 505, 514, 200 A. 2d 150; *Long v. State,* 3 Md. App. 638, 639, 642, 240 A. 2d 620; *Gray v. State,* 4 Md. App. 175, 180, 241 A. 2d 909; *Morris v. State,* 4 Md. App. 328, 331, 242 A. 2d 582; *Chandler v. State,* 7 Md. App. 646, 651, 256

A. 2d 695; *Street v. State*, 26 Md. App. 336, 338, 338 A. 2d 72.[42]

Even prior to *Mullaney v. Wilbur*, twenty-four states had recognized that once a defendant had fairly raised the issue of self-defense by producing some evidence in that regard, the burden fell upon the State to negate self-defense beyond a reasonable doubt.[43]

In *Wilson v. State*, 28 Md. App. 168, 343 A. 2d 537, Judge Menchine, for this Court, dealt with the situation where the issue in a homicide case is excuse because of accident or misadventure. He concluded with respect to that defense, at 28 Md. App. 178:

> "We hold, accordingly, that where, as here, there is evidence tending to show that a killing was unintentional, occasioned in the course of a lawful act, the accused is entitled to an instruction that the burden rests upon the State to prove beyond a reasonable doubt that such lawful act was grossly negligent. The charge of the trial court, placing that burden of proof upon the accused, was reversible error." [44]

The Court of Appeals has recently, in *State v. Grady*, 276 Md. 178, 345 A. 2d 436, utilized the principle of *Mullaney v. Wilbur* and *Winship* to disapprove a jury charge placing upon a defendant the burden of proving an alibi defense. Although the alibi defense had not, to be sure, been one of

---

42. Sixteen other states — Arkansas, Delaware, Georgia, Idaho, Kentucky, Nevada, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Washington and West Virginia — were with Maryland in placing the burden of persuasion upon the defendant. See Annotation, *Homicide: Modern Status of Rules as to Burden and Quantum of Proof to Show Self-Defense*, 43 A.L.R.3d 221.

43. Alabama, Arizona, California, Colorado, Florida, Illinois, Indiana, Iowa, Louisiana, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Jersey, New Mexico, New York, North Dakota, Oklahoma, South Dakota, Vermont and Virginia. See Annotation, *Homicide: Modern Status of Rules as to Burden and Quantum of Proof to Show Self-Defense*, 43 A.L.R.3d 221.

44. And see *State v. Poole*, 33 OhioSt.2d 18, 294 N.E.2d 888, and Annotation, *Homicide: Burden of Proof in Defense That Killing Was Accidental*, 63 A.L.R.3d 936.

the "affirmative defenses," the opinion of the Court of
Appeals, speaking through Judge Digges, teaches clearly
that *Mullaney v. Wilbur* will not be read narrowly and
grudgingly, 276 Md. 182, at 345 A. 2d 438:

> "Extending the rationale of *Winship*, the Supreme
> Court interpreted the due process clause of the
> fourteenth amendment as requiring the prosecution
> to prove beyond a reasonable doubt the absence of
> heat of passion when that issue was properly
> presented in a homicide case. . . We conclude that
> the teachings of these Supreme Court cases apply
> to the issue of who has the burden of proof and
> what that burden is when an accused relies on an
> alibi as a defense. In sum, under the Federal
> Constitution, as well as the law of Maryland, the
> burden is on the State to prove all elements of the
> alleged crime and to do so beyond a reasonable
> doubt. . ."

The principle of *Mullaney v. Wilbur* will apply to the
affirmative defenses generally.

## 2. *The Five Faces of Heresy*

The forms taken by the constitutional heresy in Maryland
have been curiously varied. The most blatant and visible, of
course, is where the jury is instructed that a defendant must
prove mitigation (or justification or excuse or whatever) by a
preponderance of the evidence.[45] Even in the subtler forms,
however, whenever a jury is told that an element of the
*mens rea* is to be presumed, the State has been
unconstitutionally relieved of its rightful burden under the
Due Process Clause of proving every element of the crime
(including all necessary aspects of the *mens rea*) beyond a
reasonable doubt. It may be helpful to catalogue briefly five
frequently employed errors made in describing the so-called
presumption of malice — four of them unconstitutional and

---

45. One is tempted to call this our "express unconstitutionality" with the
slightly subtler errors being our "implied unconstitutionality."

one of them an absurd tautology. In looking at the errors, we need again to take our bearings on the fixed point that "malice" comprehends three distinct aspects: 1) intent, 2) absence of justification or excuse and 3) absence of mitigation. Unless all three coalesce, there is no "malice."

### a. *The Threefold Unconstitutionality*

The statement is sometimes made, "The law presumes all homicides to be committed with malice aforethought and to constitute murder." *Chisley v. State,* 202 Md. 87, 105, 95 A. 2d 577 [the errors, some now of the third and fourth generation, which can trace their pedigrees back to this single case, are almost without number]; *Faulcon v. State,* 211 Md. 249, 257, 126 A. 2d 858; *Elliott v. State,* 215 Md. 152, 159, 137 A. 2d 130; *Bruce v. State,* 218 Md. 87, 98, 145 A. 2d 428; *DeVaughn v. State,* 232 Md. 447, 456, 194 A. 2d 109; *Day v. State,* 2 Md. App. 334, 342, 234 A. 2d 894; *Dubs v. State,* 2 Md. App. 524, 538, 235 A. 2d 764. This broadest of the statements relieves the State of proving 1) an intent to kill or do grievous bodily harm; 2) the absence of justification or excuse and 3) the absence of mitigating circumstances.

### b. *The Twofold Unconstitutionality*

The statement is sometimes slightly less broad, "The inference of malice may be drawn from the fact of the use of a deadly weapon directed at a vital part of the body." *Tate v. State,* 236 Md. 312, 317, 203 A. 2d 882; *Veney v. State,* 251 Md. 159, 175, 246 A. 2d 608; *McFadden v. State,* 2 Md. App. 725, 728, 237 A. 2d 93. The use of a deadly weapon directed at a vital part of the human body, of course, simply gives rise to the inference that the killing was intentional. From this established fact of an intentional killing — but one aspect of malice — the remainder of malice is then presumed. The State is relieved of its burden of proving 1) the absence of justification or excuse and 2) the absence of mitigation. A variant form of this unconstitutionally broad statement is found in *Coit v. State,* 7 Md. App. 70, 73, 253 A. 2d 526, "The intent to commit *murder* is shown by an intent to commit grievous bodily harm . . ." (Emphasis supplied)

### c. *The Onefold Unconstitutionality*

Sometimes, slightly more careful statements offend the Constitution only in a single regard, "An intentional killing, absent justification or excuse, will be presumed to be with malice." *Gunther v. State,* 228 Md. 404, 411, 179 A. 2d 880; *Lindsay v. State,* 8 Md. App. 100, 104, 258 A. 2d 760. A variant form of the same mistake is, "An intentional and *unlawful* [thereby precluding justification or excuse] killing will be presumed to be with malice." *Law v. State,* 21 Md. App. 13, 30, 318 A. 2d 859; *Abney v. State,* 244 Md. 444, 448, 223 A. 2d 792. When the presumption appears in these forms, the first two aspects of malice are given as having been established and the State is relieved of its burden of proving only the third aspect of malice — the absence of mitigation.

### d. *A Reverse Form of the Onefold Unconstitutionality*

The presumption sometimes appears in the following form, "The law presumes that in the absence of mitigation, all homicides are committed with malice and constitute murder." *Woodard v. State,* 13 Md. App. 114, 122, 282 A. 2d 9; *Simms v. State,* 4 Md. App. 160, 168, 242 A. 2d 185. In this form, the absence of mitigation is a given fact and the State is relieved of its burden of proving simply the second aspect of malice — the absence of justification or excuse.

### e. *The Tautology*

Sometimes the constitutionally inoffensive but semantically inane statement is made, "An intentional killing, absent justification, excuse or some circumstance of mitigation, will be presumed to be with malice." *Tate v. State,* 236 Md. 312, 317, 203 A. 2d 882; *Davis v. State,* 237 Md. 97, 103, 205 A. 2d 254; *Veney v. State,* 251 Md. 159, 175, 246 A. 2d 608; *Wilson v. State,* 261 Md. 551, 563, 276 A. 2d 214; *Williams v. State,* 2 Md. App. 170, 176, 234 A. 2d 260; *Lawrence v. State,* 2 Md. App. 736, 739, 237 A. 2d 81; *Brown v. State,* 4 Md. App. 261, 267, 242 A. 2d 570; *Jacobs v. State,* 6 Md. App. 238, 242, 251 A. 2d 33; *Bagley v. State,* 6 Md. App.

375, 379, 251 A. 2d 246; *Dyson v. State,* 6 Md. App. 453, 456, 251 A. 2d 606; *Shotkosky v. State,* 8 Md. App. 492, 507, 261 A. 2d 171; *Cook v. State,* 9 Md. App. 214, 217, 263 A. 2d 33; *King v. State,* 14 Md. App. 385, 389, 287 A. 2d 52. The obvious question is, "Why presume malice when all of its elements are already given as established facts?" Since malice *is*, by definition, "intentional killing absent justification, excuse or mitigation," the above statement posing as a presumption is no presumption at all. From A, B and C, we may presume D; but from A, B and C, we do not *presume* A, B and C. The "presumption" as thus expressed is the equivalent of saying, "From the given establishment of all elements of malice, we will presume malice," or, alternatively, "From an intentional killing, absent justification, excuse or mitigation, we will presume an intentional killing, absent justification, excuse or mitigation." No matter how constitutionally innocuous this meaningless tautology, it has abiding potential to confuse the hearer as it has obviously confused the utterers.

The obvious source of most of the semantic difficulty is the confusing presence of an unnecessary middle term — "malice." Our problem is to define "murder." We do so by calling it a killing with "malice." Since no layman has the remotest idea what that means, we then define "malice" as "1) the intent to kill (or its equivalents) plus 2) the absence of justification or excuse plus 3) the absence of mitigation." Why not simply define "murderous intent" as "the intent to kill (or its equivalents) without justification, excuse or mitigation "? If A equals B and B equals C, why not say simply that A equals C? Only the powerful inertia of ingrained habit can account for the failure of fresh thought to expunge the misbegotten term "malice" from the vocabulary of our homicide law. In this regard, we agree specifically with the Supreme Court of Michigan in *People v. Dunn,* 233 Mich. 185, 197, 206 N. W. 568, 572:

"'If the jurors are told what constitutes legal justification or excuse, and what circumstances will reduce the killing to manslaughter, they have all the law they need to determine whether the

particular homicide is murder or not, without the mention of the word "malice." ' 13 R.C.L. 773."

Even more generally, we agree with the Court of Appeals of Michigan in *People v. Morrin*, 31 Mich. App. 301, 187 N.W.2d 434, 445:

"If the language of the common law is misleading it should be clarified. It is the duty of the common-law courts to speak clearly in language that jurors can understand, not to persist in the lazy repetition of words which have lost all capacity to convey relevant thoughts and which are frequently misleading."

In dealing with the presumption of malice, the Maryland case law indicates that it has been unsure of itself. The opinions give off certain intimations occasionally that they are groping, tentatively and unsurely, toward the light of the Thayer-Wigmore concept of the presumption (to be discussed in the next section). Even as some of our cases place the burden on a defendant of proving his affirmative defense by a preponderance of the evidence, they sometimes precede this a few sentences earlier or follow this a few sentences later with some such statement as, "But if upon all of the evidence, you are not convinced beyond a reasonable doubt that the defendant (did not act in self-defense, did not kill in hot blood, etc.) you should acquit." These cases seem to be trying to put the burden of persuasion simultaneously on both the State and the defense. The Supreme Judicial Court of Maine, in *State v. Millett*, 273 A. 2d 504, 506, pinpointed the judicial ambiguity in terms we find incisive, citing Maryland as an example of the semantic drift:

"We are aware that over the years the trial courts in Maine have treated self-defense as an affirmative defense to be proven by the defendant by evidence from whatever source by the fair preponderance of that evidence ... It is perhaps because of an awareness that there has been no guiding decision on the point in this State and a

further awareness that there is a conflict of authority in other jurisdictions, that the practice has grown up in our trial courts of giving the secondary or saving instruction given in this case requiring acquittal if upon the whole evidence the jury entertains a reasonable doubt as to guilt. Yet upon examination it is clear that the two instructions impose two different burdens with respect to self-defense which stand in conflict with each other.

...Without doubt the problem is at times one of semantics. In *Gunther v. State* (1962) 228 Md. 404, 179 A. 2d 880, 883, after stating the rule that self-defense must be proved by a fair preponderance of the evidence and the State is not required to overcome the defense beyond a reasonable doubt, the Court continued, 'It is thus apparent that the burden of proving self-defense *to the satisfaction of the jury* or the court (as the case may be) is on the defendant, but, it is likewise clear that if, upon all of the evidence, a reasonable doubt exists as to the guilt of the defendant, the trier of the facts ought to acquit him.' (Emphasis ours) Here the Court seemingly equates proof 'to the satisfaction of the jury' with proof by the fair preponderance of the evidence."

*State v. Malone,* 327 Mo. 1217, 39 S.W.2d 786, dealt with an erroneous instruction placing the burden upon a defendant of proving self-defense by a preponderance of the evidence. It dealt further with whether that error could be averted by a concluding sentence "to the effect that if there is reasonable doubt of defendant's guilt he should be acquitted." On the effect of these conflicting instructions, the court said, at 39 S.W.2d 790:

"A lawyer might work out a construction to reconcile and harmonize that positive direction with the concluding sentence and the presumption of innocence to which defendant is entitled, but it is

> not likely a jury of laymen could do so. To say the best of it, the instruction was likely to be misunderstood by, and to mislead, the jury."

A similar situation was dealt with in *State v. Grady,* *supra.* There, as the Court of Appeals found, an erroneous instruction was given placing the burden upon the defendant to establish his alibi defense. Earlier in the jury instruction, the jury had, to be sure, been told that if "after a full and fair consideration of all the facts and circumstances in evidence, you find that the government has failed to prove beyond a reasonable doubt that the defendant was present at the time when, and the place where, the offense charged was allegedly committed, you must find the defendant not guilty." Notwithstanding this correct statement as to the burden upon the State, contained in one section of the instructions, Judge Digges squarely held that Maryland will brook no strained apologia in an effort to rationalize the irrational, at 276 Md. 185, 345 A. 2d 440:

> "Reading this instruction in that light, we conclude that it was improper to explain alibi testimony as did the trial judge since, at the very least, one rational interpretation of the words used would place an impermissible burden of proof upon the respondent. The Achilles' heel of the instruction is that it could be understood as meaning that, while the State must prove its case against the accused beyond a reasonable doubt, the defendant has the responsibility of establishing his alibi, and apparently must even do so conclusively. Though, from the trial judge's words, the jury may have properly construed the respondent's obligation, we must assume that the improper inference was drawn because the latter portion of the instruction, quoted earlier in this opinion, is misleading, ambiguous and confusing."

Whatever tentative gropings there may have been, it is nonetheless clear that Maryland has been applying the presumption of malice in the Morgan tradition and not in

the Thayer-Wigmore tradition. It is clear that we have been referring to a burden of persuasion being upon a defendant and not a mere burden of producing some evidence, since our statements as to the burden on a defendant to exculpate by way of justification or excuse or to mitigate by showing hot blood almost invariably have followed and have grammatically paralleled a preceding statement about the burden being upon the State to raise murder to murder in the first degree. It cannot be argued that different types of burden were being dealt with on opposite sides of the semicolon. It is clear from the statements themselves that whatever type of burden (indisputably a burden of persuasion) was upon the State in the first instance was the same type that was upon the defendant in the second instance.

It is, moreover, clear that our cases were speaking of a burden of persuasion and not a mere burden of producing evidence, since our discussions invariably were in the context of jury instructions. Under the Thayer-Wigmore theory of presumptions, once there is in the case, whether produced by the defense or by the State, sufficient evidence to generate a genuine jury issue, the presumption dissipates and the jury never hears of it. When a jury, therefore, has been instructed about "presumptions" and "burdens," the thing being discussed is by definition a burden of persuasion.

A presumption in this sense, placing a burden of persuasion upon a defendant, is flatly unconstitutional under *Mullaney v. Wilbur* and *Winship*.

## H. *Head Five of the Hydra: A True Presumption (In the Thayer-Wigmore Tradition)*

A presumption in the Thayer-Wigmore tradition simply places upon a defendant the onus of producing evidence, or of relying at his risk upon evidence produced by the State, sufficient to generate a jury issue with respect to a particular defense. Once the issue is generated by evidence, the presumption totally dissipates (the bubble bursts) and

the State assumes the burden of persuasion on that issue beyond a reasonable doubt. Since the presumption has totally served its purpose once a jury issue has been created, the jury never hears of the presumption. If the issue has not been generated by evidence, the jury never receives the issue. Once the issue is generated, the jury gets the issue with the burden of persuasion thereon falling upon the State. The preliminary skirmishing on the generation *vel non* of the jury issue is of no concern to the jury itself.

The reasons of necessity requiring such an initial burden of producing some evidence, or of relying upon evidence produced by the State, to fall upon a defendant are clear. They are well set out in LaFave and Scott, *Criminal Law* (1972), at 47:

"As to the burden of production of evidence, it is uniformly held that the defendant is obliged to start matters off by putting in some evidence in support of his defense — e.g., evidence of his insanity, or of his acting in self-defense, or of one of the other affirmative defenses — unless of course the prosecution, in presenting its own side of the case, puts in some evidence of a defense, in which case the matter of defense is properly an issue though the defendant himself produces nothing further to support it. Experience shows that most people who commit crimes are sane and conscious; they are not compelled to commit them; and they are not so intoxicated that they cannot entertain the states of mind which their crimes may require. Thus it makes good sense to say that if any of these unusual features are to be injected into the case, the defendant is the one to do it; it would not be sensible to make the prosecution in all cases prove the defendant's sanity, sobriety and freedom from compulsion. Perhaps experience might show that homicides and battery are, as often as not, committed in self-defense; but even if this is so, it would still be wise (in the interests of simplifying

issues and saving time which would be spent in presenting matters on which there is no dispute, and because the defendant normally has greater opportunity to know the facts) to place the burden of production on the defendant."

In dealing with the presumption of sanity, which presumption in the proper Thayer-Wigmore sense places upon a defendant the obligation to see that there is produced sufficient evidence of insanity to generate a jury question in that regard, *Bradford v. State*, 234 Md. 505, 509, 200 A. 2d 150, pointed out very concisely the reason of necessity behind such a presumption:

"This presumption is a creature of necessity and serves principally to save time in the trial of the issues presented by the pleadings. Otherwise a great deal of time and effort would be wasted if in every case the prosecution had to introduce full evidence of sanity as it does of all other material facts."

Maryland has traditionally placed upon a defendant, by the device of giving the State the benefit of a presumption to the contrary, the obligation to see that there is produced sufficient evidence to generate a jury question on such issues as intoxication, *Bateman v. State*, 10 Md. App. 630, 272 A. 2d 64; *Mock v. State*, 2 Md. App. 771, 237 A. 2d 811; insanity, *Bremer v. State*, 18 Md. App. 291, 315-316, 307 A. 2d 503; *Dennis v. State*, 13 Md. App. 564, 569, 284 A. 2d 256; *Strawderman v. State*, 4 Md. App. 689, 698, 244 A. 2d 888; self-defense, *Street v. State*, 26 Md. App. 336, 338-341, 338 A. 2d 72; and entrapment, *Fisher v. State*, 28 Md. App. 243, 345 A. 2d 110.

We are persuaded that nothing in *Mullaney v. Wilbur* adversely affects in any way the status of presumptions in this limited function of requiring that there be produced sufficient evidence to generate a jury issue. The holding of *Mullaney v. Wilbur* was very careful to add a qualifying clause, at 44 L.Ed.2d 522:

"We therefore hold that the Due Process Clause

requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented in a homicide case.*" (Emphasis supplied)

*Mullaney v. Wilbur* went on very explicitly, at 44 L.Ed.2d 521, n. 28:

"Many States do require the defendant to show that there is 'some evidence' indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt . . . *Nothing in this opinion is intended to affect that requirement.*" (Emphasis supplied)

*Mullaney v. Wilbur* went on, at 522, n. 31, to explain that constitutionally proper presumptions simply shift to a defendant the burden of producing evidence (or of relying, at his risk, upon the evidence produced by the State) and not the burden of ultimate persuasion:

"Generally in a criminal case the prosecution bears both the production burden and the persuasion burden. In some instances, however, it is aided by a presumption, see *Davis v. United States* . . . (presumption of sanity), or a permissible inference, see *United States v. Gainey* . . . (inference of knowledge from presence at an illegal still). These procedural devices require (in the case of a presumption) or permit (in the case of an inference) the trier of fact to conclude that the prosecution has met its burden of proof with respect to the presumed or inferred fact by having satisfactorily established other facts. Thus, in effect they require the defendant to present some evidence contesting the otherwise presumed or inferred fact. See *Barnes v. United States* . . .

In each of these cases, however, the ultimate burden of persuasion by proof beyond a reasonable doubt remained on the prosecution . . ."

Instructive as well are the authorities cited by *Mullaney v. Wilbur*. It refers, at 44 L.Ed.2d 521, n. 28, to LaFave and Scott, *Criminal Law* (1972), 539, whereat it is stated:

"[I]t is everywhere agreed that the prosecution need not in the first instance introduce evidence of facts which negative the existence of mitigation, justification or excuse."

The same footnote in *Mullaney v. Wilbur* also refers to Perkins, *Criminal Law* (2d Ed. 1969) 50-51. Professor Perkins' treatment of the presumption of malice states, in pertinent part, at 49-50:

"There is, however, a true presumption of malice aforethought. It would be an unreasonable burden upon the prosecution to require it in every murder case to prove not only the killing of the deceased by the defendant, but also the non-existence of every conceivable set of circumstances which might be sufficient to constitute either innocent homicide or guilt of manslaughter only. Thus the state is not required to prove (in addition to the killing of the deceased by the defendant) that the defendant was not so insane as to be wanting in criminal capacity, or that the killing was not by accident, or that it did not result from the privileged use of deadly force, or that it did not result from the sudden heat of passion engendered by adequate provocation, or other matters of this kind. To require such proof would constitute an absurd waste of time. This difficulty is avoided by a rule of law in the form of a presumption. . . .

Since this is a presumption in the true sense it merely places upon the defendant the burden of going forward with the evidence."

Another of the authorities relied on heavily by *Mullaney v. Wilbur* was Fletcher, *Two Kinds of Legal Rules: A Comparative Study of Burden-of-Persuasion Practices in Criminal Cases*, 77 Yale L.J. 880 (1968), wherein the

propriety of shifting a production burden to a defendant and the impropriety of shifting a persuasion burden to the defendant was made clear, at 908:

"Yet acknowledging the prosecutor's problems of proof does not compel the conclusion that the defendant must bear the burden of persuasion on the issue; his difficulties properly justify only a demand that the defendant go forward on the issue. Once the defendant has raised a triable issue under one of the statutory exceptions, one might reasonably expect the prosecutor to bear the risk that the jury in the end would be in equipoise on the issue."

Maryland is familiar with the proper functioning of a presumption in a criminal case, that is, in the Thayer-Wigmore tradition, because this is our established mode of operating in dealing with insanity. There is initially a presumption of sanity, which presumption shifts to the defendant the obligation to see that there is produced legally sufficient evidence to generate a jury question. When that burden is met, the presumption dissipates and disappears totally from the case. The jury receives no instruction as to any presumption in that regard. The State rather bears the full burden of proving sanity beyond a reasonable doubt. This proper treatment of a presumption was spelled out very clearly in *Bradford v. State, supra,* at 234 Md. 512:

"[A]t the outset, the presumption of sanity places the initial burden of producing evidence on the defendant. But once the presumption has been rebutted it disappears as a rule of law and has no probative value as evidence. See Thayer, *A Preliminary Treatise on Evidence at the Common Law,* p. 576. When this takes place, the burden of producing evidence as well as persuading the trier of facts falls upon the State and it must then prove sanity beyond a reasonable doubt as it must do in proving all other elements of the crime."

As to the quantum of evidence necessary to generate a jury issue, it was well set out by Judge Powers in *Fisher v. State, supra,* at 28 Md. App. 248-249, 345 A. 2d 114:

> "It should here be emphasized that the defense of entrapment cannot be considered as 'having been raised' — that entrapment cannot become an issue for the trier of the facts — unless there is sufficient evidence which, if deemed weighty and credible by the trier of the facts, would support a finding that the police, directly or through their agent, induced the defendant to commit the offense charged. . . .
>
> The initial test of the evidence, within the framework of the substantive law of entrapment, is always a matter of law for the court."

Generally speaking, the defensive evidence will be controverted by the evidence, circumstantial or direct, in the State's case. When the defendant, therefore, produces evidence, he has in most cases simply generated an issue for the jury. The jury retains full prerogative to accept or reject the defensive evidence and it must be persuaded by all of the evidence that the defendant is guilty beyond a reasonable doubt. In some instances, however, where all evidence points toward the existence of the defense and where nothing in the State's case, circumstantial or otherwise, controverts the defense in any regard, the evidence may be so clear and decisive as to leave no issue of fact and to generate a counter-presumption (not a mere jury issue) and to entitle the defendant to a directed verdict as a matter of law. As a general rule, however, the defendant will simply generate a jury question.

Of particular interest is *Mullaney v. Wilbur*'s reference, at 44 L.Ed.2d 521, n. 30, to the decision of the Maine Supreme Judicial Court in *State v. Millett, supra*:

> "In *Millett* the Maine Supreme Judicial Court adopted the 'majority rule' regarding proof of self-defense. The burden of producing 'some evidence' on this issue rests with the defendant, but

the ultimate burden of persuasion by proof beyond a reasonable doubt remains on the prosecution."

That decision of the Maine Supreme Judicial Court in *State v. Millett* is a superlative statement of the effect of a presumption in the Thayer-Wigmore tradition. The decision points out emphatically that no instructions to the jury involving the presumption are ever appropriate in any way. The treatment, at 273 A. 2d 507-508, is a classic, textbook analysis of how properly to deal with the presumption:

"We are satisfied that we should now adopt the majority rule. It has the virtue of relative simplicity and should eliminate that apparent confusion which has arisen when trial courts have attempted to harmonize a burden of proof imposed upon the defendant with the continuing obligation of the State to prove guilt beyond a reasonable doubt. Since the claim of justification by self-defense is not raised by plea, it need not be anticipated by the State but will enter the case as an issue only if and when substantial evidence bearing on the issue is introduced, from whatever source that evidence may come. In that sense only can it be said that the defendant has a burden, the burden of coming forward with evidence of justification which will generate the issue and justify a finding by the factfinder, if indeed one is made, that by reason of the claimed justification a reasonable doubt exists as to defendant's guilt. As has frequently been stated, the defendant's burden under these circumstances is purely procedural and there is no occasion for instructions to the jury with respect to it. . . . '. . . "The shifting of the burden of evidence is governed by rules of procedure which are designed solely for the guidance of the court; with respect to their observance, operation, or effect, the jury has no function to perform." '. . . Having concluded as a matter of law that the self-defense issue is thus properly tendered, the

> trial court need only instruct the jury as to the elements of self-defense. He will have no occasion to speak of burden of proof other than to explain the State's burden of proving guilt beyond a reasonable doubt. If the evidence adduced, so viewed, is legally insufficient to raise the issue, the trial court will have no occasion or obligation to instruct the jury on the elements essential to a valid claim of self-defense, but rather will remove the issue of self-defense from jury consideration."

We conclude that nothing in *Mullaney v. Wilbur* adversely affects the presumption in Maryland of the latter two aspects of malice, to wit, the absence of justification or excuse and the absence of mitigation, just so long as the courts are careful to attach to the word "presumption" its properly limited meaning, in the Thayer-Wigmore tradition, of merely placing upon a defendant the obligation of producing evidence, or of relying, at his peril, upon the evidence produced by the State, sufficient to generate a jury issue. His is the risk of non-production. Whether a jury question is or is not generated by the evidence is always for the court, never for the jury, to decide.

\* \* \*

To all of the foregoing, a fitting benediction is McCormick, *Law of Evidence* (1st ed. 1954), at 639:

> "One ventures the assertion that 'presumption' is the slipperiest member of the family of legal terms, except its first cousin, 'burden of proof'. . . ."

One need only add "malice" for a grand slam.

### III. The Ghost of Homicide Present

We hold that *Mullaney v. Wilbur* applies retroactively to this case. The issue of mitigation, by way of an arguably hot-blooded response to the provocation of a mutual affray, was fairly in the case. Under the circumstances, the jury instruction to the effect that malice might be presumed

(including therein the presumption of non-mitigation) unconstitutionally relieved the State of its burden of proving the element of non-mitigation beyond a reasonable doubt. When the instruction went further and placed an affirmative burden on the defendant to prove mitigation by a preponderance of the evidence, it aggravated what was already unconstitutional even without the aggravation.

We further hold that the jury instruction was unconstitutional on the subject of self-defense. That issue was fairly in the case. The jury instruction to the effect that malice might be presumed (including therein the presumption of non-justification and non-excuse) unconstitutionally relieved the State of its burden of negating justifiable or excusable self-defense beyond a reasonable doubt. The additional instruction placing an affirmative burden on the defendant to prove justification or excuse by a preponderance of the evidence simply aggravated what was already unconstitutional even without the aggravation.

*Judgment reversed; case remanded for a new trial.*